# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

FLORIDA PREBORN RESCUE,
INC., ALLEN TUTHILL,
ANTONIETTE M. MIGLIORE,
and SCOTT J. MAHURIN,

      Plaintiffs,

v.                    CASE NO.: 8:23-cv-01173

CITY OF CLEARWATER,
FLORIDA,

      Defendant.

_____/

## COMPLAINT FOR PRELIMINARY AND
## PERMANENT INJUNCTIVE RELIEF REQUESTED

Plaintiffs, FLORIDA PREBORN RESCUE, INC., ALLEN TUTHILL, ANTONIETTE M. MIGLIORE, and SCOTT J. MAHURIN ("Plaintiffs"), sues Defendant, CITY OF CLEARWATER, FLORIDA ("Defendant"), and alleges as follows:

## PARTIES

1.    Plaintiff FLORIDA PREBORN RESCUE, INC. ("Preborn Rescue"), is a Florida not-for-profit corporation headquartered in Pinellas Park, Florida. It is an entity capable of bringing suit in court, including this action. It was formed in 2012 to pursue a Christ-centered pro-life sidewalk ministry. The activities of Preborn

Rescue outside the Clinic are entirely peaceful and expressive.  Its members are trained to follow a peaceful, prayerful, law-abiding program intended to reach the hearts of people outside the abortion facility and offer loving assistance, including information regarding places where expectant mothers can obtain free clothing for their child and free child-care.  Plaintiffs typically engage people entering the Clinic in conversation and, when appropriate, by handing them literature.  Both Plaintiffs' literature and conversations provide reasons for rejecting abortion and information about free pregnancy centers and other life-affirming alternatives.

2.     Preborn Rescue has standing to bring claims on behalf of its members, including its volunteers, under the principles of third party and organizational standing.  Specifically, its members, including its volunteers, would otherwise have standing to sue in their own right, the interests Preborn Rescue seeks to protect are germane to the organization's purpose, and neither the claims asserted, nor the relief requested, requires the participation of individual members in the lawsuit.

3.     Plaintiff ALLEN TUTHILL is a member of Preborn Rescue.  Since March 2022, he has regularly counseled, on Tuesdays and Thursdays, abortion minded women from the public right of way outside the Clinic.  He has never been cited or warned that he has committed any violation of law during the course of his ministry.  He does not engage in aggressive or confrontational behavior; he does not direct any such behavior to individuals seeking abortions, volunteer escorts, or

others present outside the Clinic.  To do so would be antithetical to his personal beliefs and to the purpose and effectiveness of his sidewalk ministry.

4.     Plaintiff ANTONIETTE M. MIGLIORE is a member of, and was trained by, Preborn Rescue.  For the last three years, she has ministered or counseled abortion-minded women on Tuesdays and Thursdays from the public right of way outside of the Clinic.  Before that, on rare occasions, she had gone on Saturdays only to pray the Rosary quietly at the Clinic.  She has never been cited or warned that she has committed any violation of law during the course of her ministry.  She does not engage in aggressive or confrontational behavior; she does not direct any such behavior to individuals seeking abortions, volunteer escorts, or others present outside the Clinic.  To do so would be antithetical to her personal beliefs and to the purpose and effectiveness of her sidewalk ministry.

5.     Plaintiff SCOTT J. MAHURIN is Preborn Rescue's President.  For many years, he has regularly counseled, on Tuesdays and Thursdays, abortion-minded women from the public right of way outside the Clinic.  He has never been cited or warned that he has committed any violation of law during the course of his ministry.  He does not engage in aggressive or confrontational behavior; he does not direct any such behavior to individuals seeking abortions, volunteer escorts or others present outside the Clinic.  To do so would be antithetical to his personal beliefs and to the purpose and effectiveness of his sidewalk ministry.

6.     Defendant CITY OF CLEARWATER, FLORIDA ("City") is a municipal corporation created and organized under the laws of the State of Florida. Its actions at issue in this case were undertaken and performed under color of state law.  It is an entity capable of being sued, including in the present case, and is capable of being sued under 42 U.S.C. § 1983.  It enjoys no immunity from suit for the claims asserted herein.

7.     The City and its officials are responsible for enforcing the ordinances of the City of Clearwater, including the recently enacted ordinance at issue in this case.

8.     The City and its recently enacted City Code § 28.10 are the moving force behind the deprivations of Plaintiffs' constitutional rights described herein.

9.     The City and its officials are responsible for creating, adopting, approving, ratifying, and enforcing the rules, regulations, ordinances, laws, policies, practices, procedures, and/or customs of the City, including the policies, practices, and procedures of its personnel as set forth in this complaint.   These rules, regulations, ordinances, laws, policies, practices, procedures, and/or customs are the moving force behind actions that deprived and are depriving Plaintiffs of their fundamental constitutional rights as set forth in this complaint.

10.     The City has approved of and ratified the acts, policies, practices, customs, and/or procedures of its personnel, that deprived and are depriving Plaintiffs of their fundamental constitutional rights as set forth in this complaint.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1988, 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 28 U.S.C. §§ 2201-02.

12.     Plaintiffs' state law claims are properly before this Court pursuant to 28 U.S.C. § 1367(a) because they are so related to the claims in the action that are within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because it is the judicial district in which the defendant resides as well as because it is a district in which a substantial part of the events or omissions giving rise to the claims have occurred and future deprivations of Plaintiffs' constitutional rights are threatened and likely to occur.

14.     This Court has authority to grant the requested injunctive relief under 28 U.S.C. § 1343, the requested declaratory relief under 28 U.S.C. §§ 2201-02, and costs and attorneys' fees under 42 U.S.C § 1988(b) and Fla. Stat. Ann. § 761.04.

15.    Any and all conditions precedent to the bringing of this suit have been satisfied, and Plaintiffs' claims are ripe for review and decision.

16.    Additionally, the City's prior unconstitutional actions, as described by this complaint, are likely to be repeated through future enforcement of the Ordinance against Plaintiffs and other similarly situated persons and entities.

## BACKGROUND

17.    Plaintiffs are a nonprofit and individuals who engage in devoted Christ-centered pro-life sidewalk counseling outside the abortion clinic known as Bread and Roses Woman's Health Center ("Clinic"), located at 1560 South Highland Avenue in Clearwater, Florida.

18.    Though the Clinic performs abortions on Tuesdays, Thursdays and Saturdays, Plaintiffs only minister, sidewalk counsel, and provide information to abortion-minded women at the Clinic on Tuesdays and Thursdays.

19.    From the sidewalk outside the Clinic, Plaintiffs seek to have conversations with abortion-minded women and to provide them with both verbal and written information to make sure they know they have a choice not to abort, there are people who care about them and their babies, and there is help available to them (people and organizations who will help and support them and assist them in accessing available resources) if they decide against abortion and require assistance for themselves or their babies.

20.     Plaintiffs also offer leaflets reflecting the same kinds of information. They provide this information to people entering and exiting the Clinic, including to individuals in vehicles that briefly stop to receive this literature.

21.     The City of Clearwater, however, has now adopted an Ordinance which targets individuals, like Plaintiffs, who have a pro-life viewpoint and which precludes Plaintiffs any meaningful opportunity to minister or provide information to abortion-minded women entering or exiting the Clinic.

22.     The Ordinance profoundly infringes upon Plaintiffs' First Amendment and other rights, because of their religiously based pro-life viewpoint, while doing nothing to ameliorate the harms it purports to address.  Therefore, Plaintiffs bring this action for relief.

## FACTS

23.     On March 16, 2023, the City Council passed Ordinance 9665-23, which was codified as City Code § 28.10 ("Ordinance").  A true and accurate copy of the Ordinance is attached hereto as **Exhibit 1**.

24.     The Ordinance targets the speech of people with a pro-life viewpoint, including Plaintiffs, at a single abortion clinic known as Bread and Roses Woman's Health Center ("Clinic") located in the City of Clearwater.

25.     The Ordinance restricts certain people from approaching on a public right-of-way within five feet of the driveway entering the Clinic:

> No pedestrian . . . or person riding a bicycle . . . or person operating any other non-motorized vehicle, shall enter into or cross any portion of the vehicular driveway located at the western entrance to the clinic, or enter that portion of the sidewalk or swale located within five (5) feet north or south of the concrete driveway. This restriction shall be in effect only from Monday through Saturday, beginning 7:00 am and ending 6:00 pm each day.

City Code § 28.10(1).

26.    The Ordinance exempts certain other people from the Ordinance's restrictions, expressly allowing such persons to enter and occupy the area on the public right-of-way from which all others are prohibited.  In that regard, the Ordinance provides:

> This section shall not apply to police and public safety officers, fire and rescue personnel, or other emergency workers in the course of their official business, or to authorized security personnel employees or agents of the hospital, medical office or clinic engaged in assisting patients and other persons to enter or exit the Clinic.

City Code § 28.10(1).

27.    The purpose of the Ordinance, as expressly stated in the Ordinance itself, is to control and restrict the activities, including the speech and expression, of people who oppose abortion while standing on the right-of-way outside the clinic.

28.    This purpose is set forth in three of the first four "whereas" clauses introducing the alleged justifications for the Ordinance:

> WHEREAS, the exercise of a person's right to protest or counsel against certain medical procedures is a First Amendment activity . . . must be balanced against another person's right to obtain medical and treatment . . .

> WHEREAS, On June 24, 2022, the Supreme Court released the decision *Dobbs v. Jackson Woman's Health Organization*, holding that the United States Constitution confers no constitutional right to abortion services . . .
>
> WHEREAS, after the release of the decision, the Clearwater Police Department began seeing a rise in aggression and confrontation between individuals seeking abortions, volunteer escorts for the women seeking abortions, and protesters . . . .

29.  During hearings on the Ordinance, similar statements were made by representatives of the City, evidencing the City's desire to suppress and control the speech and activities of people expressing pro-life views on the public right-of-way outside the Clinic.

30.  For example, one councilmember stated at the hearing in which the Ordinance passed first reading that he was supporting the measure because he found "language" used by pro-life advocates to be "just disturbing."

31.  Another member of the city council expressed his support for the Ordinance in that same council meeting, telling pro-life advocates that they were being "hear[d]" sufficiently and that he would "recommend" they undertake "message control."

32.  The city council unanimously passed the ordinance, undertaking to control Plaintiffs' message itself, with the result that Plaintiffs' sidewalk counseling is silenced since the overwhelming majority of patrons to the Clinic arrive in vehicles.

33.     There are two primary instances at the Clinic in which Plaintiffs engage in conversations and leafletting.  Plaintiffs engage occupants of a vehicle as it enters the Clinic's parking lot, or as the vehicle is leaving, if those in the vehicle choose to stop and briefly engage in conversation with Plaintiffs.  Whether stopping on the way in or out of the Clinic's parking lot, the car is well off the street when it stops to allow the occupants to speak with Plaintiffs.  The photo in Figure 1, immediately below, shows the wide driveway in which this occurs.  The vehicle's position when it stops does not interfere with vehicles traveling on the roadway.  Plaintiffs remain on the sidewalk at the edge of the driveway, in the public right-of-way, until the vehicle stops and a passenger or driver indicates a willingness to communicate.  Plaintiffs are careful to make sure any contact with the occupants of vehicles entering or leaving the Clinic parking lot does not block access into or out of the parking lot.

34.     Figure 1 shows the Clinic at 1560 S. Highland Avenue Clearwater, Florida prior to the Ordinance:



35.     The Ordinance, however, now requires Plaintiffs to remain on the public right-of-way five feet back from the edge of the driveway on either side.

36.     In addition, the Ordinance restricts Plaintiffs from entering the right-of-way of the driveway, even briefly, to approach closer to a vehicle stopped there, safely off the roadway, because it states that "[n]o pedestrian . . . shall enter into or cross . . . the vehicular driveway."  City Code § 28.10(1).

37.     Figure 2 below shows the sidewalk from the north side of the Clinic entrance, looking south, with white lines painted post-Ordinance:



38.    Figure 3 below shows the sidewalk from the south side of the Clinic entrance, looking north, with white lines painted post-Ordinance:



39.    At the distance required by the Ordinance, it is impossible for Plaintiffs to hand any leaflets to people in cars entering or exiting the Clinic, even though leafletting is one of Plaintiffs' main First Amendment activities at the Clinic.

40.     Plaintiffs abide by the Ordinance for fear of being cited or arrested by City police, who are often nearby to enforce the buffer zone against pro-life individuals.

41.     Upon information and belief, since the Ordinance was passed Clearwater police have cited at least two pro-life protestors, not with Plaintiffs' organization, who briefly stepped across the line to deliver a pamphlet or engage in conversation.

42.     The five-foot setoff required by the Ordinance also makes it much more difficult for the Plaintiffs to engage in quiet, heartfelt conversations with occupants in the cars stopping in the driveways.  Before the Ordinance, Plaintiffs could walk onto the right-of-way area of the driveway and stand next to a vehicle stopped there, so long as another car was not in the process of entering or exiting behind the stopped vehicle.  It was not unusual for Plaintiffs to proceed as much as five feet into the driveway briefly to converse with the occupants of the vehicles stopped in the driveway.  Plaintiffs now must attempt to conduct such sensitive conversations at a distance at least five feet away, and sometimes as much as ten feet further away than before the Ordinance.  That often makes a quiet, personal conversation nearly impossible and cannot be done without raising voices notably.

43.     Before the Ordinance, the other primary instance at the Clinic in which Plaintiffs engaged in speech and expressive activity occurred after Clinic patrons

had parked in the Clinic's lot and were walking to the front door of the Clinic. Vehicles nearly always first fill up the parking spaces on the north side of the Clinic's parking lot, closest to the building, before resorting to parking spots on the more distant south side of the lot. Before the Ordinance, Plaintiffs had a straight line-of-site to those Clinic patrons, either standing at the edge of the driveway on the north side or as walking across the driveway from the south side. Clinic patrons thus could see Plaintiffs addressing them and engage in conversation if they cared to. This is not possible now.

44. Before the Ordinance, Plaintiffs were able to get nearest to the people in the parking lot when they stood near the end of the white fences shown in the photos above, while Plaintiffs stood on the sidewalk at the edge of the driveway. Those were the only spots where the people in the parking lot were out of the way of vehicles entering or leaving the parking lot and could see Plaintiffs face-to-face while close enough to talk in conversational tones.

45. Thus, because of the buffer zone, which is demarcated by the white painted lines shown in Figure 4 below, Plaintiffs cannot engage in this conversational behavior.

46. Figure 4 shows the painted white lines, post-Ordinance, restricting use of public driveway and sidewalk:



47.    Since passage of the Ordinance, Plaintiffs must stand at a spot where they are never able to have a direct line-of-site to the Clinic patrons parking near the building, which is the majority of patrons. (*See* Figure 5 immediately below.)  After they close their car door, Clinic patrons may hear a voice of one of the Plaintiffs behind the fence, but there can be no eye contact, and there is little reason for the Clinic patron to stop and talk.

48.    Figure 5 shows the line-of-site view toward the parking lot from the north sidewalk, standing at the edge of the white line established in response to the Ordinance:



49.     Plaintiffs on the edge of the south side's white line would have to yell very loudly to get the attention of the Clinic patron, which Plaintiffs do not do since it is counterproductive to the gentle conversations they are trained to engage in.  In addition, even if the Clinic patron were interested in speaking to a Plaintiff calling from the white line south of the driveway, the Ordinance forbids Plaintiffs from crossing the driveway to get nearer the Clinic patron for a conversation that does not involve shouting and likewise forbids the clinic patron from approaching Plaintiffs.

50.     Figure 6 shows the view from the edge of the Ordinance line on the south sidewalk:



51.     Ironically, due to the Ordinance, if Plaintiffs need to go from one side of the driveway to the other, they now must walk directly into the street, competing with moving vehicular traffic.  Previously, Plaintiffs were able to walk on the public right-of-way across the driveway.

52.     In adopting the Ordinance, the City expressly asserted the reason for the Ordinance was to protect pedestrians.  Nevertheless, as described above, the Ordinance has dramatically increased the danger to Plaintiffs and other pro-life citizens.  Indeed, it is not only pro-life counselors who are endangered by the effects of the Ordinance. Rather, *all pedestrians* on the sidewalk must suffer the same fate.  Therefore, due to the Ordinance, all pedestrians (and bicycle riders) now must enter the vehicular portion of the street and jockey with moving automobiles.

53.     Despite claims that being in the restricted area of the public-right-of-way is dangerous, the Ordinance expressly allows individuals who hold pro-abortion

views and who volunteer as Clinic escorts ("escorts") to walk and stand in the very area allegedly constituting a danger to all pedestrians.  The Ordinance provides: "This section shall not apply to . . . authorized security personnel employees or agents of the . . . clinic engaged in assisting patients and other persons to enter or exit the Clinic." City Code § 28.10(1).

54.    Thus, individuals holding and expressing a pro-abortion viewpoint (the so-called clinic "escorts") are allowed to remain in the very area from which the pro-life Plaintiffs are barred, and in which at least one pro-life protestor has been arrested for crossing the line established by the Ordinance.

55.    In practice, since the Ordinance was passed police have enforced it as it is written: arresting a pro-life citizen and excluding other persons expressing a pro-life viewpoint from the area prohibited by the Ordinance, while simultaneously permitting persons with a pro-abortion viewpoint to occupy at will the entire restricted area and to express their viewpoint with pro-abortion signs, as noted in Figure 7 immediately below.

56.    Figure 7 shows pro-choice Clinic "escorts" occupying the restricted area, post-Ordinance, complete with pro-abortion signs located within the buffer zone:



57. "Escorts" like those shown in the photo are engaged in pro-abortion expressive activity within the buffer zone. Within the buffer zone, they openly, and in plain view of the Clinic, as well as police (who are often present), carry messages with pro-abortion signs such as "Keep Abortion Legal." The Ordinance permits that expressive activity, while barring Plaintiffs' expressive activity, based solely on the difference in viewpoints espoused by the escorts and Plaintiffs; therefore, the Ordinance discriminates based on viewpoint. In addition to many such signs, like that shown in Figure 7, the "escorts" carry over-sized umbrellas (regardless of the weather) specifically to block Plaintiffs, as well as others espousing a pro-life message, from engaging in face-to-face conversations with Clinic patrons.

58.     Figure 8 shows a pro-choice Clinic "escort" occupying the restricted area, post-Ordinance:



59.     Figure 9 shows another pro-choice Clinic "escort" in the restricted area, post-Ordinance together with another person (whose image has been redacted) seen from the line on the south sidewalk:



60.    Moreover, such "escorts" or, to use the Ordinance's terminology,
"agents of the Clinic," are often hostile, loud, and disruptive in opposition to the pro-
life message communicated by Plaintiffs as well as others seeking to communicate
a pro-life message on the public sidewalk outside the Clinic.  This is acknowledged
in the Ordinance itself, which reads:

> WHEREAS, after the release of the decision, the Clearwater Police Department began seeing a rise in aggression and confrontation between . . . volunteer escorts for the women seeking abortions, and protesters, [and]
>
> WHEREAS, the Clearwater Police Department has . . . to mediate continuing and now escalating confrontation between those individuals and associated groups . . . .

61.    Contrary to the City's purported "dangers to pedestrians" justification for enacting the Ordinance, both before and after enactment of the Ordinance, police have occupied the now restricted public right-of-way on the driveway, at times shoulder-to-shoulder with the pro-abortion "escorts," even allowing the pro-abortion protestors to run along immediately next to the vehicles moving through the driveway.

62.    Similarly, the Ordinance exempts the Clinic's employees. City Code § 28.10(1).  As shown in Figure 10 below, those employees routinely walk through the buffer zone, even sharing it with entering vehicles. If the Ordinance truly is intended to protect pedestrians, it fails to explain why Clinic workers do not deserve such protection.

63.    Figure 10 shows a Clinic employee walking within the restricted area, post-Ordinance:



64.    Also inconsistent with the purported justification for the Ordinance, as previously noted, the Ordinance actually compels Plaintiffs, other persons with a pro-life viewpoint, pedestrians, and bicyclists, into traffic along the road in front of the Clinic.

65.    The Ordinance is at odds with the purported justifications for its enactment, and its provisions actually undermine its claimed purposes.

66.    The city council knew when it enacted the Ordinance that it would suppress and silence Plaintiffs' advocacy at the clinic by preventing them from engaging in sidewalk counseling at that location.  Nevertheless, the City proceeded with enactment and enforcement of the Ordinance.

67.    Proponents of the Ordinance sought its enactment with the purpose and intent of curtailing, controlling, and suppressing Plaintiffs' speech due to disagreement with Plaintiffs' message and viewpoint.

68.    The Ordinance was enacted by the City with constitutionally invidious motives, specifically with the purpose and intent to curtail, control, and suppress Plaintiffs' speech due to disagreement with Plaintiffs' message and viewpoint.

69.    Despite the illogic of the Ordinance's restrictions, Plaintiffs have faithfully abided by them.  As a result, they have been hindered and prohibited from engaging in the speech and activities, including leafleting and speaking with abortion-minded individuals at the Clinic, that they engaged in prior to the Ordinance.

70.    Plaintiffs' desire to engage in sidewalk counseling is based on their religious beliefs, as found in the Bible and as articulated in the teachings of their

faith, both historically and today, which hold that abortion constitutes the taking of innocent life.

71.     Plaintiffs now fear for their constitutionally protected rights and have in fact had their First Amendment activity chilled due to fear of enforcement of the Ordinance, especially since violation of the Ordinance is a Class III civil infraction under Florida state law.

72.     Plaintiffs have been curtailed from the First Amendment activity they previously engaged in and that they would continue to engage in, absent the presence and enforcement by the City of the Ordinance.

73.     Plaintiffs have no other adequate alternatives available to them for expression of their views at the Clinic.

74.     The City did not attempt less restrictive measures prior to enacting the Ordinance, and the Ordinance is not narrowly tailored.

75.     In particular, the justifications recited by the city council in the Ordinance's "whereas" clauses can all be addressed through less restrictive means, are constitutionally insufficient or invalid grounds for the Ordinance according to case law, and/or are otherwise irrelevant to the issue of whether the law is appropriate under these circumstances.

76.     Alternatively, both facially and as applied, the Ordinance fails the rational basis test because its prohibition of certain categories of speech—but not

others—has no rational relation to any legitimate government interest in securing access to abortion facilities as opposed to prohibiting the "unwanted" speech of pro-life sidewalk advocates and counselors in particular—a patently unconstitutional purpose.

77.    The enactment and enforcement of the Ordinance also infringe upon Plaintiffs' free exercise of religion by preventing them from engaging in their Christ-centered ministry of sidewalk counseling, which is based on their religious beliefs opposing abortion.

78.    As a direct and proximate result of the Ordinance, Plaintiffs' constitutionally guaranteed rights are being and will continue to be violated by the City, unless they receive relief from this Court.

79.    Plaintiffs have a present and future desire and intention to engage in lawful First Amendment activity in front of the Clinic and to use certain means of communication, but they fear being cited by law enforcement.

80.    Plaintiffs have a present and future desire and intention to engage in lawful activity protected by the Constitution of the State of Florida, which, like the First Amendment to the United States Constitution, guarantees their right to free speech and free exercise of religion, but they fear being cited by law enforcement.

81.   As a proximate result of the violations of the federal and state constitutions described in this complaint, Plaintiffs have suffered violations of their constitutional rights as well as damages, which were reasonably foreseeable.

82.   The right to engage in peaceful counseling and outreach in quintessential public forums is guaranteed by the First Amendment to the United States Constitution, as applied to the states and their political subdivisions by the Fourteenth Amendment.

83.   The City's enforcement of the Ordinance chills and deters Plaintiffs' exercise of their fundamental constitutional rights, and it is not a law of general application, instead being targeted at Plaintiffs and those holding similar views.

84.   The loss of First Amendment freedoms for even minimal periods of time unquestionably constitutes irreparable injury.

85.   Plaintiffs have no plain, adequate, or complete remedy at law to redress the foregoing violations of their constitutional rights and liberty interests, and this suit is their only means of securing complete and adequate relief.

86.   Preliminary and permanent injunctions are necessary to prevent future and ongoing violations of Plaintiffs' rights, all of which are reasonably likely to occur absent injunctive relief from this Court.

87.     No other remedies would offer Plaintiffs substantial and complete protection from the City's unlawful conduct, and Plaintiffs will suffer significant and irreparable harm unless this Court intervenes.

**COUNT I:**
**First Amendment to the U.S. Constitution**
**(Facial Unconstitutionality)**
**(42 U.S.C. § 1983)**

88.     The preceding paragraphs are hereby realleged and incorporated herein by reference.

89.     The Ordinance, City Code § 28.10, constitutes a content-based restriction on speech on its very face.

90.     As a content-based restriction on speech, City Code § 28.10 can be upheld as constitutional only if it can satisfy strict scrutiny.

91.     City Code § 28.10 does not serve a compelling governmental interest and is not narrowly tailored to serve any such interest.

92.     City Code § 28.10 is not the least restrictive means of achieving any governmental interest.

93.     Therefore, City Code § 28.10 cannot satisfy strict scrutiny.

94.     Moreover, City Code § 28.010 is not a valid time, place, or manner regulation because it fails intermediate scrutiny.  In addition to the fact that it is not content neutral, City Code § 28.10 is not narrowly tailored to achieve a substantial

and legitimate governmental interest, burdens substantially more speech than necessary, and does not leave open ample alternative channels of communication.

95.    Plaintiffs also have sincerely held religious beliefs that compel them to engage in sidewalk counseling and advocacy against abortion.

96.    The Ordinance targets Plaintiffs' sincerely held religious beliefs by effectively prohibiting their sidewalk counseling ministry against abortion, for the reasons already stated, in violation of the Free Exercise Clause of the First Amendment.

97.    By reason of City Code § 28.10, which has been created, adopted, and enforced under color of state law, the City has deprived and continues to deprive Plaintiffs of their rights in violation of the Free Speech and Free Exercise Clauses of the First Amendment, as applied to the states and their political subdivisions by the Fourteenth Amendment to the United States Constitution.

98.    As a direct and proximate result of the City's violation of the Free Speech and Free Exercise Clause of the First Amendment, Plaintiffs have suffered and will reasonably suffer in the future irreparable harm, including the loss of their constitutional rights, entitling them to declaratory and injunctive relief and damages, both nominal and compensatory, pursuant to 42 U.S.C. § 1983.

## COUNT II:
## First Amendment to the U.S. Constitution
## (Unconstitutional as Applied)
## (42 U.S.C. § 1983)

99.    The preceding paragraphs are hereby realleged and incorporated herein by reference.

100.    City Code § 28.10 is also unconstitutional as applied to Plaintiffs.

101.    By prohibiting Plaintiffs from engaging in their tradition peaceful sidewalk counseling, the Ordinance deprives Plaintiffs of necessary channels for communication with no adequate alternatives.

102.    The City's enforcement of City Code § 28.10 against Plaintiffs is also based on constitutionally invidious motives, including the desire to silence speech with which the City and its officials disagree.

103.    Meanwhile, City Code § 28.10 and its enforcement permit favored, pro-choice speech in the buffer zone it creates.  Since enactment of City Code § 28.10 is has been enforced by the City to prohibit pro-life speech in the buffer zone, while permitting pro-choice advocacy in the same area.

104.    Therefore, City Code § 28.10 is unconstitutional as applied.

105.    As a direct and proximate result of the City's violation of the Free Speech and Free Exercise Clauses of the First Amendment, Plaintiffs have suffered and will reasonably suffer in the future irreparable harm, including the loss of their

constitutional rights, entitling them to declaratory and injunctive relief and damages, both nominal and compensatory pursuant, to 42 U.S.C. § 1983.

**COUNT III:**
**Florida Constitution – Article I, §§ 3, 4 & 5**
**(Facial and As-Applied Violations)**

106.   The preceding paragraphs are hereby realleged and incorporated herein by reference.

107.   The Florida Constitution protects the "right peaceably to assemble," Fla. Const., art. I, § 5, and moreover provides that "[e]very person may speak, write and publish sentiments on all subjects . . . [and] [n]o law shall be passed to restrain or abridge the liberty of speech or of the press," Fla. Const., art. I, § 4.

108.   The Florida Constitution similarly provides that "[t]here shall be no law respecting the establishment of religion or prohibiting or penalizing the free exercise thereof."  Fla. Const., art. I, § 3.

109.   As with the United States Constitution, the City's actions violate the parrallel provisions of the Florida Constitution, specifically Sections 3, 4, and 5 of the Declaration of Rights, both facially and as applied.

110.   As a direct and proximate result of the City's violation of the Florida Constitution, Plaintiffs have suffered and will reasonably suffer in the future irreparable harm, including the loss of their constitutional rights, entitling them to declaratory and injunctive relief and damages, both nominal and compensatory.

## COUNT IV:
## Florida Religious Freedom Restoration Act of 1998
## (Fla. Stat. Ann. § 761.01 *et seq.*)

111.    The preceding paragraphs are hereby realleged and incorporated herein by reference.

112.    Plaintiffs' desire to engage in sidewalk counseling outside of abortion clinics is based on their religious beliefs about the sanctity of life, including unborn life, and reflects the longstanding tenets, practices, and customs of their faith, not merely a personal preference regarding religious exercise.

113.    Accordingly, Plaintiffs' sidewalk counseling is religiously motivated conduct.

114.    The Ordinance substantially burdens Plaintiffs' exercise of religion.

115.    As explained above, the Ordinance is not in furtherance of a compelling governmental interest; and, even if it does further a governmental interest that is compelling, the Ordinance is not the least restrictive means of furthering that compelling governmental interest.

116.    As a direct and proximate result of the City's violation of the Florida Restoration of Freedom Act, Plaintiffs have suffered and will reasonably suffer in the future irreparable harm, including the loss of rights protected by said Act, entitling them to declaratory and injunctive relief and damages, both nominal and compensatory.

## COUNT V:
### Declaratory Judgment Relief
### (28 U.S.C. §§ 2201-02)

117.   The preceding paragraphs are hereby realleged and incorporated herein by reference.

118.   An actual controversy exists between the parties concerning the constitutionality of the Ordinance (City Code § 28.10), both facially and as applied to Plaintiffs.

119.   A declaratory judgment is necessary and appropriate as it would serve a useful purpose in clarifying and settling particular legal issues between the parties and thereby afford relief from much of the uncertainty and controversy giving rise to this proceeding.

120.   Accordingly, under 28 U.S.C. §§ 2201-02 and Rule 57 of the Federal Rules of Civil Procedure, Plaintiffs pray for declaratory and related relief declaring and defining the rights among the parties.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court grant the following relief:

1.    Assume jurisdiction over this action;

2.      Declare that the City is violating and threatens to further violate Plaintiffs' clearly established and fundamental federal and state constitutional rights, as set forth in this complaint;

3.      Declare that City of Clearwater Code § 28.10 is both facially unconstitutional and unconstitutional as applied to Plaintiffs, under by the United States and Florida Constitutions;

4.      Declare that the City has substantially burdened, unlawfully infringed upon, and violated Plaintiffs' rights under the First and Fourteenth Amendments as well as the Florida Constitution;

5.      Declare that the City has violated Plaintiffs' rights, as protected by the Florida Religious Freedom Restoration Act;

6.      Enter a preliminary injunction as soon as practicable enjoining the City (and the other entities and persons set forth in Federal Rule of Civil Procedure 65(d)(2)) from enforcing City Code § 28.10;

7.      Enter a permanent injunction enjoining the City (and the other entities and persons set forth in Federal Rule of Civil Procedure 65(d)(2)) from enforcing City Code § 28.10;

8.      Award Plaintiffs nominal and compensatory damages for the claims asserted in this complaint;

9. Award Plaintiffs their reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988, Fla. Stat. Ann. § 761.04, and as otherwise provided by law;

10. Tax costs of this action against the City;

11. Award Plaintiffs prejudgment and post-judgment interest; and

12. Grant Plaintiffs such other and further relief as this Court may deem just and proper.

DATED:  May 26, 2023

Respectfully submitted,

*/s/ R. Quincy Bird*
R. Quincy Bird (FBN 105746)
**WEBER, CRABB & WEIN, P.A.**
5453 Central Avenue
St. Petersburg, FL  33710
Tel: (727) 828-9919; Fax: (727) 828-9924
Primary:  Quincy.Bird@webercrabb.com
Secondary:
honey.rechtin@webercrabb.com

*/s/ Gerasimos "Jerry" Theophilopoulos*
Gerasimos "Jerry" Theophilopoulos
(Fla. Bar No. 0068380)
**THEOPHILOPOULOS LAW**
P.O. Box 816
Tarpon Springs, FL 34689
Tel.: (727) 945-1112; Fax: (727) 945-9224
jerry@theolaw.com

Joan Mannix[†]
B. Tyler Brooks[†]

**THOMAS MORE SOCIETY**
309 W. Washington Street, Suite 1250
Chicago, IL 60606
Tel.: (312) 782-1680; Fax: (336) 900-6535
jmannix@thomasmoresociety.org
tbrooks@thomasmoresociety.org

*Attorneys for Plaintiffs*

[†] L.R. 2.01(c) motion forthcoming