## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

FLORIDA PREBORN RESCUE,
INC., ALLEN TUTHILL,
ANTONIETTE M. MIGLIORE,
SCOTT J. MAHURIN, and
JUDITH GOLDSBERRY,

     Plaintiffs,

v.                             CASE NO. 8:23-cv-01173-MSS-AAS

CITY OF CLEARWATER,
FLORIDA,

     Defendant.

_____/

## PLAINTIFFS' AMENDED TIME-SENSITIVE MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW

     Pursuant to Fed. R. Civ. P. 65(a) and L.R. 3.01 and 6.02, Plaintiffs Florida Preborn Rescue, Inc. (on behalf of itself and its members and volunteers), Allen Tuthill, Antoniette M. Migliore, Scott J. Mahurin, and Judith Goldsberry (collectively, "Plaintiffs") move for a preliminary injunction prohibiting Defendant City of Clearwater, Florida, together with its officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with them, (collectively, "the City") from enforcing City Code § 28.10 (also known as Ordinance 9665-23).

Plaintiffs respectfully ask for time-sensitive relief because, as set forth below, the City's new law has prevented and will continue to prevent them from engaging in First Amendment protected activity outside of the one location in the City at which it is truly effective. As a result, they are suffering irreparable harm warranting issuance of a preliminary injunction. *See, e.g., Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (citation omitted). Relief is respectfully requested as soon as practicable, or by July 28, 2023.[1]

## INTRODUCTION

This case concerns the First Amendment rights of Plaintiffs, who seek only to distribute free literature and engage in personal, consensual, and caring conversations with women who may be contemplating abortion. An ordinance recently enacted by the City of Clearwater, however, prohibits Plaintiffs from being on the public right-of-way within five feet of the local abortion facility's public driveway—entirely cutting off their ability to distribute leaflets and engage in quiet counseling with vehicle occupants entering or exiting the abortion facility. Strangely, the City expressly relied on the Third Circuit's decision in *Bruni v. City of Pittsburgh*, even though the Third Circuit there held that a Pittsburgh ordinance did *not* prohibit leafletting and sidewalk counseling within the designated zone.

---

[1] Plaintiffs and the City have stipulated that the City may have 21 days to respond to this motion.

With this motion, Plaintiffs ask for a preliminary injunction for two separate reasons.  First, the Ordinance fails the narrow tailoring requirement for a valid time, place, and manner restriction on free speech in a traditional public forum, like a sidewalk.  Second, the City enforces the Ordinance to exclude pro-life speech from the buffer zone and yet permits pro-choice speech in the same area, thereby rendering the law unconstitutional as applied when analyzed using strict scrutiny.

## STATEMENT OF FACTS

Recently, on March 16, 2023, the City of Clearwater passed Ordinance 9665-23, codified as Section 28.10 ("Ordinance").  The Ordinance was enacted for the abortion clinic known as Bread and Roses Woman's Health Center ("Clinic"), located at 1560 South Highland Avenue in Clearwater, Florida.

Long before the Ordinance's enactment, Plaintiffs engaged in pro-life sidewalk counseling outside of the Clinic.  (**Exhibit A**: Tuthill Decl. ¶ 6; **Exhibit B**: Migliore Decl. ¶ 4; **Exhibit C**: Mahurin Decl. ¶¶ 3-5; **Exhibit F**: Goldsberry Decl. ¶ 8.)  Plaintiff Florida Preborn Rescue, Inc. ("FPR"), is a Florida non-profit founded by Scott Mahurin in 2012 to provide Christian pro-life sidewalk counseling outside of facilities where abortions occur.  (Tuthill Decl. ¶ 2; Migliore Decl. ¶ 2; Mahurin Decl. ¶ 2.)  Plaintiffs, including FPR and its volunteers, follow a peaceful, prayerful, law-abiding program intended to reach the hearts of those outside abortion facilities and offer them assistance.  (Tuthill Decl. ¶ 3; Migliore Decl. ¶ 3; Mahurin Decl. ¶ 6;

Goldsberry Decl. ¶ 3.)  This method relies on engaging abortion-minded women in a friendly conversational tone and never using aggressive words or actions.  (Tuthill Decl. ¶ 3; Migliore Decl. ¶ 3; Mahurin Decl. ¶ 6; Goldsberry Decl. ¶ 4.)  Plaintiffs provide reasons for rejecting abortion and offer information about free pregnancy centers, adoption, and other life-affirming alternatives.  (Tuthill Decl. ¶ 4; Mahurin Decl. ¶ 8; Goldsberry Decl. ¶ 5.)  They also offer information regarding places where expectant mothers can obtain tangible assistance.  (Tuthill Decl. ¶ 4; Mahurin Decl. ¶ 8; Goldsberry Decl. ¶ 5.)

Though the Clinic at issue here performs abortions on Tuesdays, Thursdays, and Saturdays, Plaintiffs counsel during the week and avoid Saturdays because on that day there are typically large numbers of both pro-life and pro-choice protestors present at the Clinic.  (Tuthill Decl. ¶ 7; Migliore Decl. ¶ 5; Goldsberry Decl. ¶¶ 8-9.)  Consequently, on Saturdays, the noise and congestion at the Clinic make that day not conducive to sidewalk counseling.  (Tuthill Decl. ¶ 7; Goldsberry Decl. ¶ 9.)

Before enactment of the Ordinance, Plaintiffs would approach occupants of a vehicle as it entered the Clinic's parking lot, or as it was leaving, if the occupants decided to stop and briefly engage in a conversation with them.  (Tuthill Decl. ¶ 8; Goldsberry Decl. ¶ 13.)  Whether stopping on the way in or out of the Clinic's parking lot, the vehicle would typically be well off the street when it stopped to allow the occupants to speak with Plaintiffs.  (Tuthill Decl. ¶ 8; Goldsberry Decl. ¶ 13.)

Thus, the vehicle's position when it stopped did not interfere with vehicles traveling on the roadway.  (Tuthill Decl. ¶ 8; Goldsberry Decl. ¶ 13.)  Plaintiffs would remain on the sidewalk at the edge of the driveway, in the public right-of-way, until the vehicle stopped and its passengers indicated a willingness to communicate.  (Tuthill Decl. ¶ 8; Goldsberry Decl. ¶ 13.)  While conversing with the occupants of these cars, Plaintiffs would take care to ensure they did not block access into or out of the parking lot.  (Tuthill Decl. ¶ 8; Goldsberry Decl. ¶ 13.)

Prior to enactment of the Ordinance, in addition to speaking with abortion-minded women heading to the Clinic, and with the occupants of vehicles entering and exiting the Clinic, Plaintiffs provided them with leaflets containing similar information and messages of support.  (Tuthill Decl. ¶ 8; Goldsberry Decl. ¶ 15.)

The City's new Ordinance, though, creates a buffer zone at the Clinic by decreeing that, with certain exceptions, no one shall "enter into or cross any portion of the vehicular driveway located at the western entrance to the clinic; or enter that portion of the sidewalk or swale located within five feet north or south of the concrete driveway."  City Code § 28.10(1) (copy attached hereto as **Exhibit D**).  The restriction applies from 7:00 a.m. to 6:00 p.m., Monday through Saturday.   In addition to its exemption for first responders like police from the ban, the Ordinance also permits "authorized security personnel employees or agents of the . . . clinic

engaged in assisting patients and other persons to enter or exit the clinic" to be in the buffer zone.  *Id.*

Since the Ordinance was enacted, Plaintiffs have been careful to stay behind the five-foot sidewalk setback, out of the driveway, and not cross into the buffer zone, which dramatically curtails Plaintiffs' ability to communicate their message. (Tuthill Decl. ¶ 9; Migliore Decl. ¶¶ 8-9; Goldsberry Decl. ¶¶ 12, 14-18, 21.)  At this increased distance required by the Ordinance, one of Plaintiffs' prior primary activities at the Clinic, providing leaflets to people entering the Clinic has become impossible.  (Tuthill Decl. ¶ 10; Mahurin Decl. ¶¶ 9-10; Goldsberry Decl. ¶ 15.)

Moreover, the buffer zone created by the Ordinance makes it much more difficult for Plaintiffs to engage in quiet, heartfelt conversations with occupants in the cars stopping in the driveways.  (Tuthill Decl. ¶ 11; Goldsberry Decl. ¶ 16.) Before the ordinance, Plaintiffs could walk onto the public right-of-way area of the driveway and stand next to a vehicle stopped there, so long as another car was not in the process of entering or exiting behind the stopped vehicle.  (Tuthill Decl. ¶ 11.) It was not unusual for Plaintiffs to proceed into the driveway to briefly converse with the occupants of the vehicles stopped in the driveway.  (*Id.*)  Now, Plaintiffs must attempt to conduct such sensitive conversations at a distance of at least five feet (if the vehicle stops right at the edge of the sidewalk which has never happened), and sometimes as much as ten feet further away than before the Ordinance.  (Tuthill

Decl. ¶ 11; Goldsberry Decl. ¶ 17.)  This makes a quiet, personable conversation effectively impossible.  (Tuthill Decl. ¶ 11; Goldsberry Decl. ¶ 17.)

Before the Ordinance, Plaintiffs would also engage with Clinic patrons who had parked in the Clinic's parking lot and were walking to the front door of the Clinic.  (Tuthill Decl. ¶ 12.)  Likewise, prior to the new law, Plaintiffs were able to start interactions with Clinic patrons near the end of the Clinic's white fence at its entrance.  (*Id.* ¶ 13.)  Now that the Ordinance has been passed, however, Plaintiffs find these personal encounters almost impossible to initiate.  (*See id.* ¶¶ 13-15; Goldsberry Decl. ¶ 18.)

Additionally, the Ordinance forbids Plaintiffs from using the public sidewalk crossing the driveway (which had routinely been used by pedestrians and bicyclists) to converse with a Clinic patron who might signal an interest in speaking.  (Tuthill Decl. ¶¶ 15-17.)  If Plaintiffs need to go from one side of the driveway to the other, now they must walk directly into the street, competing with moving vehicular traffic, since they are prohibited from crossing through the buffer zone, even if they do not stop in it.  (*Id.* ¶ 16.)  Previously, Plaintiffs were able to cross the driveway's public right-of-way and often did.  (*Id.*; *see* Goldsberry Decl. ¶ 19.)

Since passage of the Ordinance, City police have been observed allowing individuals expressing pro-choice viewpoints—namely, the so-called "escorts" at the Clinic—to occupy the entire restricted area to express their viewpoint with pro-

abortion signs and speech; the police have permitted and not attempted to stop this conduct.  (Tuthill Decl. ¶¶ 18-20; Migliore Decl. ¶ 7; Goldsberry Decl. ¶ 20.)

## LEGAL STANDARD

On a motion for preliminary injunction under Fed. R. Civ. P. 65(a), the Court considers "(1) whether there is a substantial likelihood that the party applying for preliminary relief will succeed later on the merits; (2) whether the applicant will suffer an irreparable injury absent preliminary relief; (3) whether the harm that the applicant will likely suffer outweighs any harm that its opponent will suffer as a result of an injunction; and (4) whether preliminary relief would disserve the public interest."  *Scott v. Roberts*, 612 F.3d 1279, 1290 (11th Cir. 2010); *see Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also* L.R. 6.02(a)(1).  "Although this inquiry requires plaintiffs seeking injunctions to make a 'clear showing' that they are likely to succeed at trial, . . . plaintiffs need not show a certainty of success.'" *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013) (citations omitted).

When the government bears the burden of proof on an issue, as in a challenge under the First Amendment, "the burdens at the preliminary injunction stage track the burdens at trial."  *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006).  Thus, "the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to

justify the restriction." *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011); *see Reilly v. City of Harrisburg*, 858 F.3d 173, 180 n.5 (3d Cir. 2017) ("If the moving party meets the first burden, then the government must justify its restriction on speech under whatever level of scrutiny is appropriate (intermediate or strict) given the restriction in question.") (citations omitted); *see also Casey v. City of Newport*, 308 F.3d 106, 111 (1st Cir. 2002).

## ARGUMENT

I. **THE CITY'S ORDINANCE MUST BE ENJOINED BECAUSE IT IS NOT NARROWLY TAILORED AND BLATANTLY VIOLATES *MCCULLEN V. COAKLEY* BY EFFECTIVELY PROHIBITING NON-OBSTRUCTIVE LEAFLETTING AND SIDEWALK COUNSELING.**

A. **The Ordinance Fails Even Intermediate Scrutiny Because It Burdens Substantially More Speech Than Necessary to Further the City's Purported Interests.**

The streets and sidewalks outside of the abortion facility where Plaintiffs seek to express their First Amendment rights are "quintessential" public forums. *E.g., Frisby v. Schultz*, 487 U.S. 474, 485 (1988). "[B]ecause of their historic role as sites for discussion and debate," streets and sidewalks "occupy 'a special position in terms of First Amendment protection'[.]" *McCullen v. Coakley*, 573 U.S. 464, 476 (2014) (quoting *United States v. Grace*, 461 U.S. 171, 180 (1983)). And, "the government's ability to restrict expressive activities [in such forums] is 'very limited.'" *Boos v. Barry*, 485 U.S. 312, 318 (1988) (quoting *Grace*, 461 U.S. at 177).

Even if it is assumed that the City's new Ordinance is facially content-neutral,[2] the Ordinance still fails to meet the requirements of intermediate scrutiny for a valid time, place, and manner regulation by barring multiple forms of speech by Plaintiffs in a traditional public forum.  Both facially and as applied by the City, the Ordinance flagrantly violates the Supreme Court's decision in *McCullen v. Coakley*, 573 U.S. 464 (2014), which prohibits buffer zone laws that effectively invalidate peaceful leafletting and sidewalk counseling near public driveways to abortion facilities.  "[I]n a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech."  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).  Nevertheless, any such restriction must be shown *by the government* to be "narrowly tailored to serve a significant governmental interest."  *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984).

To meet the requirements of narrow tailoring, as the Supreme Court explained in *McCullen*, "the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier."  573 U.S. at 467.  A regulation can also only be "narrowly tailored" when "it targets and eliminates no more than the exact

---

[2] "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (citations omitted).

source of the 'evil' it seeks to remedy." *Frisby*, 487 U.S. at 485 (citing *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 808-810 (1984)).[3]

In *McCullen*, the Supreme Court struck down a 35-foot buffer zone around abortion facilities because of its similar effects as the Ordinance here—including because it "**compromise[d]** petitioners' ability to initiate the close, personal conversations that they view as essential to 'sidewalk counseling,'" and "**made it substantially more difficult [] to distribute literature to arriving patients**." 573 U.S. at 487-88 (emphasis added).   Thus, even if the buffer zone furthered government interests in promoting "public safety, patient access to healthcare, and the unobstructed use of public sidewalks and roadways," it "burden[ed] substantially more speech than necessary to achieve the [state's] asserted interests." *Id.* at 486-87, 490.

The Ordinance's "whereas" clauses reveal the supposed "evils" the City hoped to eradicate: conflicts between "individuals seeking abortions, volunteer escorts . . . and protestors," protestors "imped[ing] vehicular ingress and egress," intimidation of vehicle occupants, and drains on police resources.   *See* City of Clearwater Ordinance 9665-23 (copy attached hereto as **Exhibit E**).   The Ordinance,

---

[3] Additionally, a valid time, place, or manner restriction must be content-neutral. *See McCullen*, 573 U.S. at 486.  For purposes of this motion, it is assumed *arguendo* that the Ordinance is content-neutral on its face, though Section II, *infra*, demonstrates that it is not content-neutral as applied by the City.

however, misses the target.  It instead restricts speech unassociated with the City's

concerns and even exacerbates the issues the City ostensibly sought to resolve.

In the first place, Plaintiffs are not protestors.  Plaintiffs are sidewalk

counselors.  The Supreme Court has recognized that, unlike mere protestors,

sidewalk counselors,

> seek not merely to express their opposition to abortion, but
> to inform women of various alternatives and to provide
> help in pursuing them. [They] believe that they can
> accomplish this objective only through personal, caring,
> consensual conversations.

*McCullen*, 573 U.S. at 489.  As sidewalk counselors, Plaintiffs rely on one-on-one

conversations and handing out leaflets to inform women of alternatives to abortion,

including pregnancy resources and adoption.  These methods are "classic forms of

speech that lie at the heart of the First Amendment." *Schenck v. Pro-Choice Network*

*of W. New York*, 519 U.S. 357, 377 (1997).  In fact, Plaintiffs distance themselves

from unruly protests, finding that such protests and heated environments impede the

kind of consensual conversations that prove effective at educating and ministering

to those entering the clinic.  (*See, e.g.,* Tuthill Decl. ¶ 7; Migliore Decl. ¶ 5.)

But the Ordinance ignores the distinctions identified by the Supreme Court in

*McCullen,* instead unjustifiably presuming Plaintiffs to be "protestors" necessarily

destined to impede traffic and accost abortion clinic clients.  By adopting this

blunderbuss approach, the Ordinance ignores legal and factual distinctions between

those causing the City's identified issues and those who engage in constitutionally protected conversations and leafletting.  The Ordinance therefore eliminates far more than the exact source of the "evil" it purportedly seeks to remedy and is not narrowly tailored.  While the Ordinance lands blows on constitutionally protected activities, it aggravates the City's claimed interests by forcing Plaintiffs (and others) to walk into the street if they want to cross from one side of the driveway to the other.  (*See, e.g.,* Tuthill Decl. ¶¶ 16-17.)  Consequently, the Ordinance increases, rather than decreases, the risk of impeded traffic at the Clinic.

A "[g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward*, 491 U.S. at 799.  Indeed, here the City cannot "demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen*, 573 U.S. at 467.

Specifically, the City cannot "show[]," as it must, "that it seriously undertook to address the problem with less intrusive tools readily available to it," or that "it considered different methods that other jurisdictions have found effective." *Id.* at 494.  The Supreme Court has recognized the "First Amendment virtues of targeted injunctions as alternatives to broad, prophylactic measures" like the Ordinance. *Id.* at 492.  The federal Freedom of Access to Clinic Entrances Act expressly authorizes

injunctive relief for actual physical obstructions to abortion facility access. 18 U.S.C. § 248(c).  Such "injunctive relief focuses on the precise individuals and the precise conduct causing a particular problem," whereas the Clearwater Ordinance, "by contrast, categorically excludes non-exempt individuals from the buffer zone[], unnecessarily sweeping in innocent individuals and their speech." *McCullen*, 473 U.S. at 492-93.

Other existing laws are available as well to address the asserted issues at the Clinic.  *See, e.g.,* Fla. Stat. Ann. § 316.2045 (prohibiting obstruction of public streets, highways, and roads).  While one of the Ordinance's "whereas" clauses assert that "Florida law prohibits officers from arresting" individuals for "misdemeanor crimes not committed in the officer's presence," (Ordinance 9665-23) this rule applies only to warrantless misdemeanant arrests. *Lu Jing v. State*, 316 So. 3d 724, 730 (Fla. Dist. Ct. App. 2021) (citing Fla. Stat. Ann. § 901.15(1)), *rev. denied*, No. SC21-884, 2021 Fla. Lexis 1261, 2021 WL 3234768 (Fla. July 29, 2021).  The City has pointed to no similar limits on misdemeanor citations.

A separate "whereas" clause cites an allegedly similar ordinance upheld by the Third Circuit in *Bruni v. City of Pittsburgh*, 941 F.3d 73 (2019). But in *Bruni*, the Third Circuit construed a Pittsburgh ordinance prohibiting anyone from "knowingly congregat[ing], patrol[ling], picket[ing] or demonstrat[ing]" within "15 feet from any entrance to the hospital and or health case facility" as not applying to

sidewalk counseling at all, under the doctrine of constitutional avoidance.  941 F.3d at 85-86.  The Court's opinion specifically recognized that "pass[ing] a leaflet" and sidewalk "counseling" "are not the activities that remain prohibited in the zone." *Id.* at 86 (emphasis in original).  In contrast, Clearwater's Ordinance directly prohibits leafletting and sidewalk counseling within the forbidden zone.  *Bruni* therefore provides no support for the City's Ordinance.

Finally, an additional "whereas" clause notes "an increased need for dedicated appropriation of the Clearwater Police Department's finite resources."  Ordinance 9665-23.  The Supreme Court rejected a similar justification in *McCullen*, as the First Amendment requires "the government [to] demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier"—"[a] painted line on the sidewalk is easy to enforce, but the prime objective of the First Amendment is not efficiency."  573 U.S. at 495.

As such, the Ordinance utterly fails narrow tailoring and should be enjoined for this reason alone.

### B.  The Ordinance Fails Intermediate Scrutiny Because It Does Not Leave Open Alternate Channels of Expression.

Even if there is a "close fit between ends and means" of the Ordinance, (*see McCullen,* 573 U.S. at 486), it nonetheless impermissibly restricts speech because it

does not "leave open ample alternative channels for communication of the information" Plaintiffs wish to convey.  *Clark,* 468 U.S. at 293.

"[W]hile the First Amendment does not guarantee a speaker the right to any particular form of expression, some forms—such as normal conversation and leafletting on a public sidewalk—have historically been more closely associated with the transmission of ideas than others." *McCullen*, 573 U.S. at 488.  In point of fact, Plaintiffs rely on one-on-one conversations and leafletting to inform clinic clients of alternatives to abortion.  (*See, e.g.,* Mahurin Decl. ¶ 10; Goldsberry Decl. ¶¶ 3-5, 15, 16-18.)  There is no adequate alternative for Plaintiffs to clearly communicate their message to women across the street or to passing pedestrians due to the buffer zone.

The Ordinance makes no exception for transient passage of the "vehicular safety zone."  *See* City Code § 28.10(1).  Should one of the Plaintiffs post herself five feet north or south of the driveway in the hope of speaking to some patrons, she would effectively be unable to converse with—let alone distribute leaflets to—patrons situated on the opposite side of the driveway or toward the center of the driveway's two-lanes.  If she is to speak with her, a counselor must ask an arriving client to park and approach on foot to continue a conversation or receive leaflets, making the counselor "appear 'untrustworthy' or 'suspicious,'" just like the plaintiffs in *McCullen.*  573 U.S. at 487.  Moreover, even women wishing to speak

16

to the sidewalk counselors after parking in the clinic lot are subject to the Ordinance's onerous restrictions, since the City, empowered by the Ordinance, retains the ability to cite any "pedestrian" crossing the driveway.  A Clinic client is therefore subject to being fined for entering the buffer zone to engage in a purely consensual conversation with a counselor.  *See* City Code § 28.10(1).  The fact the Ordinance prohibits even such *wanted* speech shows that it is absurd on its face, let alone that it violates intermediate scrutiny.

"[H]anding out leaflets in the advocacy of a politically controversial viewpoint . . . is the essence of First Amendment expression" and "[n]o form of speech is entitled to greater constitutional protection."  *McCullen,* 573 U.S. at 489-90 (citing *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 347 (1995)).  Whatever form a restriction takes, the government "may not prohibit all communicative activity" in "quintessential public for[a]" such as "streets and parks" which "time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions."  *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983) (internal citations omitted).

Yet, "prohibiting all communicative activity" by Plaintiffs is precisely what the Ordinance accomplishes, and it should be enjoined.

C.    A Decision from the Sixth Circuit Illustrates the Unconstitutional Nature of the City's Ordinance.

The recent decision from the U.S. Court of Appeals for the Sixth Circuit in *Sisters for Life v. Louisville-Jefferson County, Ky. Metro Government*, 56 F.4th 400 (6th Cir. 2022), enjoining a ten-foot buffer zone with identical effects as the Clearwater Ordinance is on point.  In that case, the plaintiffs (sidewalk counselors like Plaintiffs here) regularly offered leaflets and sought to engage in conversations with women entering an abortion clinic, hoping to dissuade them from choosing abortion.  *Id.* at 402.   While the clinic at issue in that case had experienced "protestors" in the past, the Court recognized a distinction between such activity and the plaintiffs' sidewalk counseling activity, which consists of "quiet, compassionate, non-threatening one-on-one conversation[s]," . . . to convince [] patients that there are lifesaving alternatives to abortion and that they will accompany the woman in whatever way she may need."  *Id.* (internal quotation marks omitted).  This is the same activity that Plaintiffs in the present case have regularly engaged in and that the new Ordinance renders all but impossible.

Similar to the Clearwater Ordinance, the ordinance in *Sisters* imposed a "buffer zone" around the entrance to the facility and forbade certain individuals from entering or remaining in that buffer zone.  *Id.*  The Sixth Circuit observed that like the 35-foot buffer zone in *McCullen*, the 10-foot buffer zone there "make[s] it 'substantially more difficult for' Sisters for Life 'to distribute literature to arriving

18

patients,' because they place potential pamphleteers **more than an arm's length away from [the abortion facility's] entrants** and make it easier for agents of [the facility] to deflect the literature they offer." *Id.* at 406 (emphasis added) (quoting *McCullen*, 573 U.S. at 488).  It further recognized that "[b]y requiring [the Clinic's] patients to be as much as ten feet away from Sisters of Life as they enter the Clinic, the buffer zone 'compromise[s]' Sisters for Life's 'ability to initiate the close, personal conversations' that are 'essential' to its compassionate, person-to-person message." *Id.* (quoting *McCullen*, 573 U.S. at 487).  The Court of Appeals noted as well that the government had failed to show that it "'seriously undertook to address' its concerns 'with less intrusive tools.'" *Id.* at 405 (quoting *McCullen*, 573 U.S. at 486).

The same infirmities are present with the Clearwater Ordinance.  Plaintiffs, like the *Sisters* plaintiffs, are sidewalk counselors who seek to engage in private, caring, and consensual conversations along with providing helpful literature to willing recipients.  The City has now completely banned Plaintiffs from engaging in this activity in the prescribed buffer zone, which is exactly the area in which those conversations are most likely to occur and be effective.  (*See, e.g.,* Tuthill Decl. ¶¶ 9-16; Migliore Decl. ¶¶ 8-10; Mahurin Decl. ¶ 10.)  Nevertheless, the City has not attempted to tailor the Ordinance to address any legitimate concerns it may have, such as ensuring safe ingress and egress, nor has it drafted the Ordinance to ensure

it addresses those interests without interfering with any more protected speech than necessary.

Just as in *Sisters*, the Clearwater Ordinance unconstitutionally violates sidewalk counselors' First Amendment rights, and a preliminary injunction should be issued.

## II.   THE CITY'S ORDINANCE SHOULD ALSO BE ENJOINED BECAUSE IT CANNOT SATISFY STRICT SCRUTINY.

### A.   The City Uses the Ordinance to Favor Pro-Choice Advocacy While Suppressing Pro-Life Views.

Even beyond the facial unconstitutionality of the Ordinance, it is unconstitutional *as applied* because the City is facilitating the expression of pro-choice speech while suppressing pro-life speech at the one location in town where such speech is likely to have an effect—outside of a facility that provides abortions. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Otto v. City of Boca Raton*, 981 F.3d 854, 872 (11th Cir. 2020) (quoting *Texas v. Johnson*, 491 U.S. 397, 414 (1989)); *see Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (citation omitted); *see also Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995) ("[T]he government may not regulate speech based on its substantive content or the message it conveys.").

The Supreme Court has recognized that a law appearing facially content neutral "will be considered [a] content-based regulation[] of speech" and, therefore, subject to strict scrutiny, where the law "cannot be 'justified without reference to the content of the regulated speech,'" or [was] "adopted by the government 'because of disagreement with the message [the speech] conveys.'" *Id.* (quoting *Ward*, 491 U.S. at 791).

The Ordinance states that it "shall not apply to . . . authorized security personnel employees or agents of the hospital, medical office or clinic engaged in assisting patients and other persons to enter or exit the Clinic." City Code § 28.10(1). As Plaintiffs explain, these "authorized agents," who are allowed to occupy the buffer zone, are pro-choice individuals.  They often call themselves "escorts" and consistently promote a pro-abortion message and confront pro-life advocates, often loudly.  (*See* Tuthill Decl. ¶ 18-20; Migliore Decl. ¶ 7.)  The new law therefore allows pro-choice messengers to enter the buffer zone and express their views without consequences, but it excludes pro-life speakers.  The City's police have enforced the Ordinance to allow occupants of the buffer zone to display or otherwise articulate pro-choice messages within the zone through both signs and oral messages.  (*See* Tuthill Decl. ¶ 18-19; Migliore Decl. ¶ 7; Goldsberry Decl. ¶¶ 20.)

The record thus demonstrates that the City is targeting the expression of not simply certain content but also a particular point of view.

### B.     The City's Ordinance Cannot Satisfy Strict Scrutiny.

Such viewpoint discrimination is *per se* unconstitutional.  *Rosenberger*, 515 U.S. at 829. But even assuming strict scrutiny for content-based regulations applies, the Ordinance cannot survive.  *McCullen*, 573 U.S. at 484-85; *see Hoye v. City of Oakland*, 653 F.3d 835, 849-52 (9th Cir. 2011); *see also Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886) (regulation may become content based when applied with "an unequal hand").   "Under strict scrutiny, content-based restrictions 'are presumptively unconstitutional' . . . [and] can be justified 'only if the government proves that they are narrowly tailored to serve compelling state interests.'"  *Otto*, 981 F.3d at 868 (quoting *Reed*, 576 U.S. at 163).  "Laws or regulations almost never survive this demanding test[.]"  *Id.* at 861-62.

In the context of a similar buffer-zone restriction outside an abortion clinic, the Supreme Court ruled in *McCullen* that the ordinance in that case did not regulate speech content because it restricted *all* speech within the buffer zone, both pro-life and pro-choice speech.  573 U.S. at 479-84.  But the *McCullen* Court pointedly cautioned that a law, even if neutral on its face, could become content-based if the government enforced it selectively.  *Id.* at 484-85.  Here, through such selective enforcement of its new Ordinance, the City is silencing a particular point of view— Plaintiffs' pro-life views.   Suppression of a viewpoint is not a compelling governmental interest.  *See Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019) ("The

government may not discriminate against speech based on the ideas or opinions it conveys.") (quoting *Rosenberger*, 515 U.S. at 829-30).  And, even if such discrimination could be justified, the City cannot satisfy the other elements of strict scrutiny. *See Reed*, 576 U.S. at 163.  This is true because the Ordinance cannot even survive intermediate scrutiny, as shown above in Section I.

Accordingly, the Ordinance should be enjoined as an as-applied violation of Plaintiffs' First Amendment rights.

## III.  ISSUANCE OF A PRELIMINARY INJUNCTION IS NECESSARY TO PREVENT IRREPARABLE INJURY TO PLAINTIFFS, WILL CAUSE NO HARM, AND WOULD BE IN THE PUBLIC INTEREST.

The remaining factors for issuance of a preliminary injunction also weigh in favor of granting Plaintiffs immediate relief.

Without an injunction Plaintiffs will suffer irreparable injury through the loss of constitutional liberties.  The "loss of First Amendment freedoms for even minimal periods of time" is "irreparable injury." *Elrod*, 427 U.S. at 373 (citation omitted); *see Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam); *cf. Hodgkins v. Peterson*, 355 F.3d 1048, 1056 (7th Cir. 2004) ("[A] realistic threat of arrest is enough to chill First Amendment rights.").  Plaintiffs' declarations show that their speech and other First Amendment activities are suppressed due to the threat presented by the new Ordinance.  (*See, e.g.,* Tuthill Decl. ¶¶ 8-15; Migliore Decl. ¶ 9.; Goldsberry Decl. ¶ 21.)  As a result, the threat of irreparable harm to

Plaintiffs is pronounced and merits relief because such harm (*i.e.*, the loss of First Amendment liberties) is necessarily irreparable.

Further, the harm Plaintiffs will likely suffer without a preliminary injunction (that is, the loss of constitutional rights) outweighs any harm that the City may suffer if one issues. The government is "in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely found to be unconstitutional. If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002).

The public interest is likewise served by an injunction because it is always in the public interest to uphold constitutional rights. *See KH Outdoor, LLC v. Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) ("The public has no interest in enforcing an unconstitutional ordinance.") (citations omitted); *Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) ("[U]pholding constitutional rights serves the public interest.") (citation omitted); *Fla. Retail Fed'n, Inc. v. AG of Fla.*, 576 F. Supp. 2d 1281, 1299 (N.D. Fla. 2008) ("prevent[ing] the enforcement of an unconstitutional" law "serve[s] the public interest"). The City meanwhile is not harmed by being unable to enforce an invalid law.

## IV.   EITHER NO BOND SHOULD BE REQUIRED OR THE AMOUNT OF THE BOND SHOULD BE NOMINAL.

Though Rule 65(c) generally requires a plaintiff to post security for a preliminary injunction, the Court may waive bond in its discretion.  *See Pashby*, 709 F.3d at 332.  Waiver is particularly appropriate if "the restraint will do the defendant no material damage[.]"  *Fed. Prescrip. Serv. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980) (citations omitted).  The City is at no risk of material damage from an injunction for Plaintiffs, who are ordinary citizens.

## <u>CONCLUSION</u>

WHEREFORE, Plaintiffs respectfully request entry of an order enjoining the City from in any way enforcing Code § 28.10 (otherwise known as Ordinance 9665-23); request that the requirement for security be waived; and request such other and further relief as the Court deems appropriate.  Plaintiffs also ask for argument and an evidentiary hearing on this motion.


DATED:  June 22, 2023                    Respectfully submitted,

                                         */s/ R. Quincy Bird*
                                         R. Quincy Bird (FBN 105746)
                                         **WEBER, CRABB & WEIN, P.A.**
                                         5453 Central Avenue
                                         St. Petersburg, FL  33710
                                         Tel.: (727) 828-9919; Fax: (727) 828-9924
                                         Primary:  Quincy.Bird@webercrabb.com
                                         Secondary: honey.rechtin@webercrabb.com

*/s/ Gerasimos "Jerry" Theophilopoulos*
Gerasimos "Jerry" Theophilopoulos
(FBN 0068380)
**THEOPHILOPOULOS LAW**
P.O. Box 816
Tarpon Springs, FL 34689
Tel.: (727) 945-1112; Fax: (727) 945-9224
jerry@theolaw.com

Joan Mannix[†]
B. Tyler Brooks[†]
**THOMAS MORE SOCIETY**
309 W. Washington Street, Suite 1250
Chicago, IL 60606
Tel.: (312) 782-1680; Fax: (336) 900-6535
jmannix@thomasmoresociety.org
tbrooks@thomasmoresociety.org

*Attorneys for Plaintiffs*

[†] L.R. 2.01(c) motion forthcoming