UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FLORIDA PREBORN RESCUE,
INC., ALLEN TUTHILL,
ANTONIETTE M. MIGLIORE,
SCOTT J. MAHURIN and JUDITH
GOLDSBERRY,

　　　　Plaintiffs,

v.                                             Case No: 8:23-cv-1173-MSS-AAS

CITY OF CLEARWATER,
FLORIDA,

　　　　Defendant.

_____

**ORDER**

**THIS CAUSE** comes before the Court for consideration of Plaintiffs' Amended Motion for Preliminary Injunction[1] ("Motion"), (Dkt. 16), and Defendant's response in opposition thereto ("Response"). (Dkt. 26) After careful consideration of all relevant filings, case law, and the evidence presented, and being otherwise fully advised, the Court hereby **DENIES** Plaintiffs' Motion. (Dkt. 16)

**I.　　BACKGROUND**

On May 26, 2023, Plaintiffs Florida Preborn Rescue, Inc., Allen Tuthill, Antoniette M. Migliore, Scott J. Mahurin, and Judith Goldsberry (collectively,

---

[1] Plaintiffs also filed a Notice of Supplemental Authority. (Dkt. 41)

1

"Plaintiffs") commenced this action against Defendant, City of Clearwater ("City"). (Dkt. 1)

In Plaintiffs' Amended Complaint for Preliminary and Permanent Injunctive Relief and Damages, Plaintiffs claim that Ordinance 9665-23 ("Ordinance"), codified as City Code Section 28.10, is unconstitutional under the First Amendment of the United States Constitution, both facially (Count I) and as-applied (Count II); that the Ordinance violates the Florida Constitution, Article I, §§ 3, 4, and 5 both facially and as-applied (Count III); that the Ordinance violates the Florida Religious Freedom Restoration Act of 1998 (Fla. Stat. Ann. § 761.01 *et seq*.) (Count IV); and that Plaintiffs are entitled to declaratory judgment relief under 28 U.S.C. §§ 2201–02 (Count V). (Dkt. 12) Plaintiffs seek, *inter alia*, a declaratory judgment, preliminary injunction, permanent injunction, damages, and attorneys' fees and costs. (Id.)

On September 21, 2023, the Court held an evidentiary hearing on Plaintiffs' Motion ("Hearing"). Plaintiffs Scott Mahurin, Allen Tuthill, and Antoniette Migliore testified as witnesses. For the City, Lieutenant Stephen Wannos, Officer Lauren Josey-Filer, and Officer Jessica Dylla testified as witnesses. Photographic, videographic, and documentary evidence was admitted. (See Dkts. 42, 44)

## I.   FINDINGS OF FACT

The Court, having evaluated the evidence presented at the Hearing and having considered the testimony and demeanor of the parties and witnesses, makes the following findings of facts.

## A. The Parties and Affected Entities

1.  Plaintiff Florida Preborn Rescue, Inc. ("Florida Preborn") is a Florida not-for-profit corporation headquartered in Pinellas Park, Florida. (Dkt. 12 at ¶¶ 1–2)

2.  Plaintiffs Allen Tuthill, Antoniette M. Migliore, and Scott J. Mahurin are members of Florida Preborn. (Id. at ¶¶ 3–5)

3.  Mr. Mahurin is also President of Florida Preborn. (Id. at ¶ 5)

4.  Plaintiff Judith Goldsberry is a pro-life activist. (Id. at ¶ 6)

5.  The individual Plaintiffs identify as "sidewalk counselors," which are persons who seek to have conversations on the sidewalk with, and provide literature to, patients and other persons entering and exiting medical centers providing abortion services. (Id. at ¶¶ 3–6, 18–21)

6.  The purported purpose of these conversations is to discourage individuals from seeking abortions or from assisting in the performance of abortions or to encourage these individuals to seek counseling and assistance associated with their decisions regarding the same. (See id. at ¶¶ 18–21; Dkt. 43 at 111:12–113:16)

7.  Defendant, City of Clearwater, is a municipal corporation created and organized under the laws of the State of Florida. (Dkt. 12 at ¶ 7)

8.  Bread and Roses Woman's Health Center is a women's health facility located at 1560 South Highland Avenue, Clearwater, Florida 33756 ("Center"). (Id. at ¶ 18)

9.  The Center provides a myriad of health services, including abortion services, which are offered on Tuesdays, Thursdays, and Saturdays. (Id. at ¶ 19; Dkt. 26 at 2)

10. Individuals unaffiliated with Plaintiffs gather at and around the Center to protest, either silently or vociferously ("Protesters").

11. Plaintiffs engage in sidewalk counseling at the Center on Tuesdays and Thursdays but typically do not go to the Center on Saturdays when it is most crowded with other Protesters. (Dkt. 12 at ¶ 19; Dkt. 43 at 63:1–19, 77:21–25, 93:5–11)

12. Before the passage of the Ordinance, Protesters often converged en masse on vehicles as they were entering or exiting the Center and placed sign placards up against the vehicles, including at the passengers' and drivers' windows.

13. Protesters also moved back and forth across the driveway entrance or stood in the driveway, blocking traffic entering or exiting the Center.

14. Such protesting activity at the Center is illustrated in the pre-Ordinance video footage. (See Dkt. 44 Sealed Ex. C – Videos to Present – Pre-Ordinance Bodycam Compilation.mp4, Pre-Ordinance – Submitted by Public for Ordinance.mov)

### B. The Ordinance

15. Following the United States Supreme Court's decision in Dobbs v. Jackson Woman's Health Organization, 142 S. Ct. 2228 (2022), the Clearwater Police Department ("CPD") repeatedly responded to calls regarding "continuing and recently escalating confrontation" at the Center where "[t]he police department ha[d] observed protest[e]rs repeatedly crossing the driveway of the health center and impeding ingress and egress of vehicle traffic and getting within close

proximity of driving cars with the intent to frighten and intimidate the vehicle occupants." (Dkts. 26-2, 26-4)

16. Communication Center Data in the record reveals seventy-three calls to respond to incidents, including battery, disorder, noise, ordinance violation, and criminal mischief, and calls for "extra duty details" at the Center between January 8, 2022, and January 7, 2023. (Dkt. 26-5)

17. CPD incident detail reports provide a record of voluminous confrontations at the Center. (See Dkt. 44-2)

18. Consequently, CPD proposed "a five-foot vehicle safety zone that will protect the public in a way that allows for citizens to exercise free speech and for citizens to safely ingress and egress the health center." (Dkt. 26-2)

19. On March 16, 2023, the City adopted the Ordinance, which creates a five-foot "Vehicular Safety Zone" on each side of the driveway that leads into and out of the Center and provides in pertinent part:

> (1) VEHICULAR SAFETY ZONE. No pedestrian as defined in F.S. 316.003(56), or person riding a bicycle as defined in F.S. 316.003(4), or person operating any other non-motorized vehicle, shall enter into or cross any portion of the vehicular driveway located at the western entrance to the clinic, or enter that portion of the sidewalk or swale located within five feet north or south of the concrete driveway. This restriction shall be in effect only from Monday through Saturday, beginning 7:00 a.m. and ending 6:00 pm each day.

City Code § 28.10.

20. The Ordinance provides the following exemption:

> This section shall not apply to police and public safety officers, fire and rescue personnel, or other emergency workers in the course of their official business, or to authorized security personnel employees or agents of the hospital, medical office or clinic engaged in assisting patients and other persons to enter or exit the Clinic.[2]

> Id.

21. The Ordinance provides the following penalty:

> (2) PENALTY. Any person, firm or corporation who pleads guilty or nolo contendere, or is convicted of violating of [*sic*] this section shall be guilty of a Class III civil infraction pursuant to section 1.12 of this Code of Ordinances.

> Id.

22. The City articulated the following reasons for enacting the Ordinance in the "WHEREAS" clauses, which provide in pertinent part:

> WHEREAS, On June 24, 2022, the Supreme Court released the decision <u>Dobbs v. Jackson Woman's Health Organization</u>, holding that the United States Constitution confers no constitutional right to abortion services, but said rights, if any, may be authorized or guaranteed by individual states; and

> WHEREAS, after the release of the decision, the Clearwater Police Department began seeing a rise in aggression and confrontation between individuals seeking abortions, volunteer escorts for the women seeking abortions, and protesters; and

> WHEREAS, the Clearwater Police Department has been consistently called upon to respond to Bread and Roses Woman's Health Center located at 1560 S. Highland

---

[2] Because the text of the exemption extends to individuals assisting "patients and other persons" to enter or exit, the Court finds that such "patients and other persons" are implicitly covered in this exemption.

Ave., Clearwater; FL 33756 to mediate continuing and now escalating confrontation between those individuals and associated groups; and

WHEREAS, the Clearwater Police Department has specifically observed pedestrian protesters entering and repeatedly crossing the driveway of the health center, so as to impede vehicular ingress and egress; and

WHEREAS, occupants of said vehicles are then accosted by the same groups of individuals; frightening and intimidating the occupants even though they have every legal right to enter the clinic; and

WHEREAS, these confrontations have created an increased need for dedicated appropriation of the Clearwater Police Department's finite resources, which are being provided to this one property, to the neglect of law enforcement needs throughout the rest of the patrol district in which the facility is located; and

WHEREAS, targeted trespass warnings to individuals impeding vehicular ingress and egress is not a remedy available by law because the driveway is located on the public right-of-way; and

WHEREAS, targeted arrests for resisting an officer without violence are impractical because the protesters will temporarily comply with an officer's instructions whenever told to vacate the driveway and allow vehicular access, but the protesters re-enter or continue crossing the driveway after the officer leaves the scene and Florida law prohibits officers from arresting the violator(s) for misdemeanor crimes not committed in the officer's presence; and

WHEREAS, the City wants to protect the public in a way that complies with both Florida law and the First Amendment; and

WHEREAS, the City is familiar with the Court's ruling in <u>Bruni v. City of Pittsburgh</u>, 941 F.3d 73 (3rd Cir. 2019), in which the Court upheld the City of Pittsburgh's

7

creation of a buffer zone when that City faced similar concerns; and

. . .

(Dkt. 26-4)

### C. The Vehicular Safety Zone

23. The Vehicular Safety Zone is demarcated by a white painted line on each side of the private driveway and is limited to the area shown in the photograph below:



(Dkt. 42-6)

24. The five-foot Vehicular Safety Zone is a mere two or three steps from the edge of the driveway leading into the Center, as shown in the photograph below:



(Dkt. 42-5)

25. This promulgated Vehicular Safety Zone cordoned off a single concrete slab measuring approximately five feet by five feet immediately adjacent to the private driveway on both sides on which non-exempt individuals cannot congregate.

26. Importantly, the Ordinance does not create a five-foot buffer zone around the Center, nor does it preclude Protesters and sidewalk counselors from standing any other place along the sidewalk immediately adjacent to the Center in all directions.

27. Non-exempt individuals can still stand on the full length of the sidewalk immediately behind the white line, up to the fencing, and at all points nearby, as shown in the post-Ordinance video footage. (See Dkt. 44 Sealed Ex. C – Videos to Present – Post-Ordinance 3-18-23.mp4, Post-Ordinance 2 3-18-23.mp4, Post-Ordinance 4-15-23.mp4)

28. Lieutenant Wannos, Officer Josey-Filer, and Officer Dylla demonstrated through their testimony that the safety concerns that prompted the passage of the Ordinance were bona fide.

29. Prior to the Ordinance, Plaintiffs conducted their counseling at the very edge of the driveway and sometimes moved into the driveway to approach cars entering and exiting the driveway. (Dkt. 12 at ¶ 34)

30. Protesters often walked into and remained in the private driveway, impeding ingress and egress to an even greater extent. (Dkt. 43 at 144:1–18, 168:10–13, 182:1–8)

31. The video footage admitted at the Hearing depicted Protesters protesting loudly, crossing the driveway repeatedly, rushing up to cars entering and exiting the driveway, and obstructing cars in the driveway.[3] (See Dkt. 44 Sealed Ex. C – Videos to Present – Pre-Ordinance Bodycam Compilation.mp4, Pre-Ordinance – Submitted by Public for Ordinance.mov)

32. Individuals approaching vehicles in the driveway necessarily impede the movement of those vehicles in either direction, impair the drivers' ability to check for oncoming traffic as they merge into traffic, and create a risk of collision between these vehicles and those traversing the driveway.

33. The Ordinance significantly reduces these safety risks.

34. Although exempt persons are permitted within the Vehicular Safety Zone, their presence does not impede traffic in this same way as there are fewer of them, and they aim to aid the flow of traffic, unlike Protesters who obstruct the flow of traffic.

35. The Center's escorts who assist patients and other persons entering and exiting the Center are exempt from the Ordinance.[4]

---

[3] While the video footage shown at the Hearing was limited to Saturdays, the same risks concerning vehicular safety would also arise on Tuesdays and Thursdays. CPD Communication Center Data and CPD reports reveal that incidents at the Center were not limited to Saturday. (See Dkts. 26-5, 44-2)

[4] The Center's escorts wear vests with "clinic escort volunteer" written on them. (Dkt. 43 at 130:6–10) Ms. Migliore testified that she has seen one escort wear a vest with "pro-choice escort" written on it. (Id. at 130:11–16) No videographic or photographic evidence of that assertion was produced, and the Court does not find it to be credible.

36. The escorts often use umbrellas to shield themselves and the Center's patients and other persons from the sun, weather, or the view of the Protesters and sidewalk counselors, but this practice predated the Ordinance and is not derivative of it.

37. Even without the directive that non-exempt individuals remain two or three steps from the driveway, the Center's escorts would be free to use their umbrellas in the same manner.

38. Regardless, the umbrellas do not prevent patients and other persons from hearing Plaintiffs or other Protesters, and if patients and other persons entering and exiting the Center do not wish to be shielded, they are free to engage with Plaintiffs.

39. To the extent Plaintiffs wish to speak in hushed tones to attempt to attract the attention of the Center's patients and other persons, that is also a matter of choice and is not a feature of the Ordinance.

40. The Ordinance does not prevent Plaintiffs from speaking in whatever tone or level they choose to use.

41. Both Mr. Mahurin and Ms. Migliore testified at the Hearing without the use of microphones to attempt to illustrate that their voices could not carry an additional five feet to attract the attention of an individual, but this demonstrative proved the opposite. (Dkt. 43 at 60:18–61:5, 94:22–95:11)

42. The evidence demonstrated that, without amplification and while speaking in normal tones, Plaintiffs can be heard five feet away.

43. Additionally, the Court finds that the Ordinance's limited directive to move two or three steps back from the edge of the driveway does not impair Plaintiffs from making eye contact with patients and other persons entering and exiting the Center.

44. Photographs taken by Plaintiffs establish that, contrary to their arguments, the Vehicular Safety Zone permits a clear line of sight to incoming vehicles, exiting vehicles, and vehicles parked in the north and south parking areas of the property. (See Dkt. 42)

45. For instance, the evidence conclusively demonstrated that Plaintiffs and all other Protesters maintain a clear line of sight into each side of the Center's parking lot and on or across the driveway, as shown in the below photographs:



(Dkt. 42-7)



(Dkt. 42-8)

46. The photographic evidence also showed their perspective vis-à-vis any person walking across the parking lot or moving on foot in or across the driveway. (See Dkt. 42)

47. If Plaintiffs or Protesters stand on the sidewalk on opposite sides of the respective parking lot zones, patients and other persons can clearly be seen, and patients and other persons can clearly see Plaintiffs or Protesters if they wish to look at them. (See Dkt. 42; Dkt. 43 at 76:6–77:5)

48. Although Mr. Mahurin claimed there may have been a decline in leafletting success since the Ordinance passed, Mr. Tuthill, who was responsible for leafletting, indicated that Florida Preborn does not keep track of leaflets numerically and thus could not definitively quantify any purported decline. (Dkt. 43 at 46:3–5; 64:17–65:6)

49. Mr. Tuthill subsequently admitted that he had stopped trying to distribute leaflets altogether. (Id. at 87:4–15)

50. Mr. Tuthill further admitted that nothing in the Ordinance prohibits someone who wants a leaflet from walking up to him to retrieve a leaflet. (Id. at 87:16–21)

51. Plaintiffs' proximity to cars and patients and other persons of the Center post-Ordinance continues to permit them to wave leaflets and advise of the availability of the information they have to offer.

52. Illustrative of this point, Ms. Migliore testified that while she was standing outside the Vehicular Safety Zone, she was able to communicate with an individual who was inside the Vehicular Safety Zone on at least one occasion. (Id. at 128:16–25)

53. That individual was able to walk over to Mr. Tuthill who was outside the Vehicular Safety Zone to engage with him; unfortunately, the encounter allegedly resulted in an altercation. (Id. at 126:23–127:2, 129:21–24)

54. Nothing in the Ordinance prohibits anyone from standing anywhere on the sidewalk beyond the designated space off the edge of the driveway and engaging in any activity whatsoever, including counseling and protesting.

55. Despite the plain text of the Ordinance, the evidentiary record does reflect inconsistent interpretations by law enforcement as to whether the Ordinance is enforceable against employees of the Center, passerby pedestrians, and passerby bicyclists. (Id. at 24:5–25:10, 151:10–17, 164:24–165:4, 174:22–176:14, 177:1–5)

56. The preliminary record, however, established conclusively that the substantive viewpoint of those warned or cited for a violation of the Ordinance has no bearing on enforcement, however inconsistent it may be. (Id. at 153:24–154:2, 169:18–170:1, 183:6–9)

57. It is uncontroverted that safety associated with crowd control at the Center has improved since implementation of the Ordinance as the driveway is now less obstructed. (Id. at 153:8–23, 168:21–169:5, 182:9–16, 183:10–13)

58. Lastly, after the passage of the Ordinance, free speech outside the Center remains quite robust, which is apparent based on a cursory review of the post-Ordinance video footage. (See Dkt. 44 Sealed Ex. C – Videos to Present – Post-Ordinance 3-18-23.mp4, Post-Ordinance 2 3-18-23.mp4, Post-Ordinance 4-15-23.mp4)

## II.    LEGAL STANDARD

It is well established that a preliminary injunction is an "extraordinary and drastic" equitable remedy that will only be granted if the moving party clearly shows that "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." ACLU of Fla., Inc. v. Miami-Dade County Sch. Bd., 557 F.3d 1177, 1198 (11th Cir.  2009).

For a preliminary injunction, the first factor is generally the most important. See Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1223, 1232 (11th Cir. 2005). A court need not consider the remaining preliminary injunction factors where the first factor fails. See Barber v. Governor of Alabama, 73 F.4th 1306, 1317 (11th Cir. 2023).

When the government bears the burden of proof on an issue, as in a challenge under the First Amendment, "the burdens at the preliminary injunction stage track the burdens at trial." Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 429 (2006).

### III.    DISCUSSION

Plaintiffs seek the extraordinary remedy of a preliminary injunction to enjoin the City from enforcing the Ordinance, on their First Amendment claims until they can make full proof of their assertions through litigation and trial. Plaintiffs argue that the Ordinance "dramatically curtails" their ability to communicate their message, makes it "impossible" to hand out leaflets, and makes it more difficult for Plaintiffs to engage in quiet conversations with occupants in the cars entering and exiting the private driveway leading into the Center's parking lot. (Dkt. 16 at 6)

In response, the City argues that the Ordinance is content-neutral, is narrowly tailored to serve the City's vehicular safety concerns, and leaves open ample alternative channels for communication. (Dkt. 26 at 9)

The First Amendment provides, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." U.S. Const. Amend. I. Because the First Amendment is applicable to the States through the Fourteenth Amendment, a municipal government vested with state authority, "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." Police Dept. of Chicago v. Mosley, 408 U.S. 92, 95 (1972). Public way and sidewalk "areas occupy a 'special position in terms of First Amendment protection' because of

their historic role as sites for discussion and debate." <u>McCullen v. Coakley</u>, 573 U.S. 464, 476 (2014) (quoting <u>United States v. Grace</u>, 461 U.S. 171, 180 (1983)).

"Still, the government may impose reasonable time, place, and manner restrictions on speech in a traditional public forum—so long as those restrictions '(1) are content-neutral, (2) are narrowly tailored to serve a significant government interest, and (3) leave open ample alternative channels of communication.'" <u>McDonald v. City of Pompano Beach, Florida</u>, 556 F. Supp. 3d 1334, 1351 (S.D. Fla. 2021) (quoting <u>Smith v. City of Fort Lauderdale</u>, 177 F.3d 954, 956 (11th Cir. 1999)). To overcome Plaintiffs' First Amendment challenge, the City bears the burden of justifying the Ordinance.

The Court, upon consideration of relevant case law, statutes, and the aforementioned findings of fact, finds that entry of a preliminary injunction cannot be supported on this record. Specifically, the Court finds that Plaintiffs have not demonstrated a substantial likelihood of success on the merits for their First Amendment claims because the City has shown that it can likely justify the Ordinance as a reasonable time, place, and manner restriction on speech. Thus, entry of a preliminary injunction is not warranted.

### A. The City will likely be able to show that the Ordinance is content-neutral and narrowly tailored to serve a significant government interest.

For a content-neutral regulation, "[courts] apply intermediate scrutiny and ask whether it is 'narrowly tailored to serve a significant governmental interest.'" <u>Bruni</u>,

941 F.3d at 83–84 (internal citations omitted). A content-neutral time, place, and manner regulation must not "burden substantially more speech than is necessary to further the government's legitimate interests." See McCullen, 573 U.S. at 486.

Notably, the regulation need not be "the least restrictive or least intrusive means" of furthering that interest. See Ward v. Rock Against Racism, 491 U.S. 781, 798 (1989). Instead, a challenged regulation is narrowly tailored if it "promotes a substantial government interest that would be achieved less effectively absent the regulation." Id. at 799. If the means chosen "are not substantially broader than necessary to achieve the government's interest," a court cannot invalidate a regulation simply because it "concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." Id. at 800.

Plaintiffs concede that the Ordinance is facially content-neutral. (Dkt. 16 at n.3; Dkt. 43 at 192:16–21, 207:11–19) Nothing in the text of the Ordinance imposes any restrictions on the content of speech. The Ordinance permits both sidewalk counselors and Protesters to continue to engage in their respective free speech activities in its many forms outside the Center, just not within the five-foot Vehicular Safety Zone.

The City asserts vehicular safety as its significant government interest. (Dkt. 26 at 15) The Ordinance was promulgated in response to a request from law enforcement, not from the Center or its patients. The City's vehicular safety concerns are established in the legislative record, which contains data on CPD visits to the Center to address interference with vehicles entering and exiting the facility there. The video footage

admitted at the Hearing depicted Protesters outside the Center obstructing the driveway and the view of drivers entering or exiting the Center. (See Dkt. 44 Sealed Ex. C – Videos to Present – Pre-Ordinance Bodycam Compilation.mp4, Pre-Ordinance – Submitted by Public for Ordinance.mov) Lieutenant Wannos, Officer Josey-Filer, and Officer Dylla personally witnessed these occurrences at the Center. (Dkt. 43 at 144:1–18, 168:10–13, 182:1–8)

The City demonstrates that the Ordinance promotes the City's interest in vehicular safety, which would be achieved less effectively absent the regulation. All three CPD witnesses testified that vehicular safety has improved since the adoption of the Ordinance. (Id. at 153:8–23, 168:21–169:5, 182:9–16, 183:10–13) Plaintiffs offer no evidence to the contrary.

The legislative record shows that the City considered potentially less restrictive alternatives, such as trespass warnings and targeted arrests. (Dkt. 26-4) CPD pursued such alternative measures when it repeatedly responded on an ad hoc basis to incidents involving battery, disorder, noise, ordinance violation, criminal mischief, and the like at the Center. (See Dkt. 26-5) The legislative record also recognizes that, because the driveway is located in a public right-of-way, trespass is not a remedy available by law for that area. (See Dkts. 26-2, 26-4) In its judgment, the City ultimately determined that the vehicular safety concerns at the Center would not be adequately addressed by alternative "after the fact" measures. (Dkt. 26 at 10) The City instituted the Vehicular

Safety Zone to address these unique concerns by directing non-exempt individuals to take two or three steps back from the edge of the driveway.[5]

Importantly, in this regard, the record before the Court indicates that the Vehicular Safety Zone in this case is distinguishable from broader buffer zones deemed unconstitutional in other cases. For instance, the thirty-five-foot buffer zone in McCullen applied to all facilities where abortions were performed, except hospitals, in Massachusetts around the entire facilities, and a violation resulted in a criminal penalty. See 573 U.S. at 469. The United States Supreme Court held, "[f]or a problem shown to arise only once a week in one city at one clinic, creating [thirty-five]-foot buffer zones at every clinic across the Commonwealth is hardly a narrowly tailored solution." Id. at 493. Similarly, the Sixth Circuit enjoined a ten-foot buffer zone in Sisters for Life, Inc. v. Louisville-Jefferson County, 56 F.4th 400 (6th Cir. 2022), which Plaintiffs here argue has "identical effects" as the Vehicular Safety Zone. (Dkt. 16 at 18) Plaintiffs are incorrect.

In Sisters for Life, the buffer zone extended "from the entrance of a healthcare facility to the closest adjacent sidewalk curb and 10 feet from side to side" 56 F.4th at 402–403 (quoting Louisville-Jefferson Ord. Code § 132.09(B)(2)). As described by the district court record, it comprised an extended "[ ] set of lines 10 feet apart [that] was

---

[5] The Ordinance's limited directive in relation to the driveway is comparable to buffer zones established in other contexts, such as election polls and private residences. See, e.g., Burson v. Freeman, 504 U.S. 191 (1992) (finding that a Tennessee statute prohibiting the solicitation of votes and display or distribution of campaign materials within 100 feet of poll entrances is narrowly tailored); Frisby v. Schultz, 487 U.S. 474 (1988) (finding that a city ordinance prohibiting picketing "before or about" a residence is narrowly tailored).

painted by Metro [Government] on the sidewalk going from the curb at Market Street to the entrance doors of EMW . . .   [, and] signs were posted on the edge of EMW's property about 30 feet to either side of the painted lines . . . [that] read: 'Healthcare Facility: No Standing or Obstructions In This Zone - LMCO § 132.09.'" Sisters for Life, Inc. v. Louisville-Jefferson Cnty. Metro Gov't, No. 3:21-CV-367-RGJ, 2022 WL 586785, at *8 (W.D. Ky. Feb. 25, 2022), rev'd and remanded sub nom. Sisters for Life, Inc. v. Louisville-Jefferson Cnty., 56 F.4th 400 (6th Cir. 2022). By this description, all along the sidewalk adjacent to the clinic, counselors were required to maintain a ten-foot distance from a patient of the facility, which precluded one-on-one counseling anywhere on the sidewalk. The Sixth Circuit found that the ten-foot buffer zone, which was not limited to the space directly on either side of the private driveway, failed narrow tailoring because it applied to all medical facilities and because the County did not show that it undertook to address its concerns with less intrusive means. See Sisters for Life, 56 F.4th at 404–407.

On the other hand, in Lucero v. Trosch, 121 F.3d 591 (11th Cir. 1997), the Eleventh Circuit upheld a twenty-five-foot buffer zone. A preliminary injunction implemented this twenty-five-foot buffer zone and enjoined the defendants "from congregating, picketing, praying, loitering, patrolling, demonstrating or communicating with others orally, by signs, or otherwise, within 25 feet of the Clinic." Id. at 605. The Eleventh Circuit found, "[a]s a matter of common sense, this provision does not seem unreasonable and does not burden more speech than necessary to

preserve the patients', doctors', and staff's right to enter the Clinic. The defendants can still express their message, but they must stand more than 25 feet from the Clinic." Id. at 606.

Likewise, in Bruni, the Third Circuit upheld a fifteen-foot buffer zone outside the entrance of *any* hospital or healthcare facility in Pittsburgh. See 941 F.3d at 77–78. The Third Circuit determined that "the relatively small buffer zone imposed by the Ordinance . . . does not prevent groups like [plaintiffs] from congregating within sight and earshot of the clinic. Nor does it prevent protest[e]rs, demonstrators, or picketers from being seen and heard, or any of these persons from speaking outside the zone with willing listeners who are entering or exiting." Id. at 90.

Unlike other buffer zones, the Vehicular Safety Zone here is only a five-foot square space adjacent to the Center's private driveway. It is geographically limited to a particular medical center, rather than all medical facilities spanning an entire state, county, or city. It is even further limited to a small portion of the public sidewalk on each side of a private driveway. The private driveway is distinct to the Center. The plain language of the Ordinance does not contemplate a criminal penalty; rather, it contemplates a civil infraction. See City Code § 28.10(2). Moreover, unlike the buffer zone in Sisters for Life, the Ordinance does not preclude any counseling along the sidewalk adjacent to the Clearwater property other than in the five-foot square space on either side of the driveway. Consequently, the evidence shows that the Ordinance

is likely narrowly tailored to address the unique vehicular safety concerns at the Center, particularly ingress and egress at the Center's private driveway.

The City expressly considered <u>Bruni</u> in the legislative record and curtailed the expanse of any restriction so that Plaintiffs and other Protesters were not prevented from being seen and heard. (Dkts. 26-2, 26-4) Plaintiffs can still choose to whisper outside the Center just as Protesters can still choose to shout outside the Center. The Ordinance, however, has no bearing on Plaintiffs' content or manner of speaking.

Importantly, the plain language of the Ordinance does not restrict speech. The Ordinance merely requires Plaintiffs who exercise their rights to free speech outside the Center to take two or three steps back from the edge of the private driveway where they claim they stood before the Ordinance. If the Ordinance curtails speech at all, it does not appear to burden substantially more speech than necessary to serve the significant government interest in vehicular safety.

### B. The current record does not show that the Ordinance should be treated as content-based or that it is unconstitutional as applied.

Though facially content-neutral, a regulation may be considered content-based and nevertheless call for strict scrutiny if it cannot be "justified without reference to the content of the regulated speech," or if it was adopted by the government "because

of disagreement with the message [the speech] conveys." See Reed v. Town of Gilbert, Ariz., 576 U.S. 155, 164 (2015) (citing Ward, 491 U.S. at 791).[6]

However, "a facially neutral law does not become content[-]based simply because it may disproportionately affect speech on certain topics. On the contrary, '[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.'" McCullen, 573 U.S. at 480 (quoting Ward, 491 U.S. at 791).

Notwithstanding this strong record, Plaintiffs suggest that the Ordinance should be subject to strict scrutiny because of the alleged motives of two individuals and the alleged unequal application in the enforcement of the Ordinance. (Dkt. 12 at ¶¶ 30–32; Dkt. 16 at 20–23; Dkt. 43 at 207:11–19) Neither claim is convincing.

First, Plaintiffs point to statements made at the meeting to consider the passage of the Ordinance by two representatives of the City as "evidenc[e] [of] the City's desire to suppress and control the speech and activities of people expressing pro-life views on the public right-of-way outside the Clinic." (Dkt. 12 at ¶ 30).[7] The Court finds that statements of two individuals cannot be attributed to the legislative body as a whole and cannot supplant the stated reasons for the passage of the Ordinance approved by

---

[6] Content-based regulations, of course, "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests" under strict scrutiny. See Reed, 576 U.S. at 163.

[7] Specifically, Plaintiffs allege one City councilmember stated that "he was supporting the measure because he found 'language' used by pro-life advocates to be 'just disturbing,'" and another council member expressed his support for the Ordinance, "telling pro-life advocates that they were being 'hear[d]' sufficiently and that he would 'recommend' they undertake 'message control.'" (Dkt. 12 at ¶¶ 31–32)

unanimous consent. As Justice Alito explained in <u>Dobbs</u>: "Even when an argument about legislative motive is backed by statements made by legislators who voted for a law, we have been reluctant to attribute those motives to the legislative body as a whole. 'What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it.'" <u>See</u> <u>Dobbs</u>, 142 S. Ct. at 2256 (quoting <u>United States v. O'Brien</u>, 391 U.S. 367, 384 (1968)). Thus, the current record establishes that the Ordinance can be justified without reference to the content of the regulated speech and that it was not adopted by the City due to a disagreement with a particular message.

Second, Plaintiffs argue that the Ordinance is unconstitutional as applied. Particularly, Plaintiffs allege that exempt persons escorting patients and other persons within the Vehicular Safety Zone have been permitted to engage in "pro-abortion" expressive activity, including speech and displaying signs, within the Vehicular Safety Zone. (Dkt. 12 at ¶ 58; Dkt. 16 at 7–8) Ms. Migliore testified inconsistently as to whether she ever saw any Center personnel or agents post signs in the Vehicular Safety Zone. She initially claimed that she witnessed a particular Center escort *removing* a sign from the Vehicular Safety Zone, but she did not see that escort place it there. Then, she testified generally that she saw that escort place and remove signs. (Dkt. 43 at 96:16–97:5) Ms. Migliore also testified that she had seen one Center escort wear a "pro-choice" vest. (<u>Id.</u> at 130:11–16) This testimony is not supported by any of the videographic or photographic evidence, and the Court does not find it to be credible.

Further, no one testified that they have ever heard any of the Center's employees or escorts providing pro-choice counseling or engaging in any pro-choice protesting within the Vehicular Safety Zone. There is no evidence that escorts are authorized by the Center or the City to engage in pro-choice or pro-life speech within the Vehicular Safety Zone. No CPD officer testified that they had observed any such activity by escorts or other Center personnel. Consequently, the Court finds that Plaintiffs' argument on this point is unsupported by the record as developed at this stage of the litigation.

Finally, Plaintiffs' assertions that enforcement of the Ordinance is based on content or viewpoint is refuted by the record. CPD witnesses testified uniformly that neither content nor viewpoint is considered when enforcing the Ordinance. (Id. at 153:24–154:2, 169:18–170:1, 183:6–9) CPD witnesses further testified that *every person* deemed in violation of the Ordinance receives a warning, regardless of that person's viewpoint. (Id. at 147:4–148:1, 169:6–17, 182:20–183:1)

Therefore, the Court finds that the Ordinance is facially content-neutral as agreed by the Parties, and the record does not support treating it as content-based or an as-applied challenge under heightened scrutiny at the preliminary injunction stage.

### C. The City will likely be able to demonstrate that the Ordinance leaves open ample alternative channels of communication.

A regulation allows ample alternative channels of communication if it does not render the plaintiff's intended message useless or seriously burdened and does not foreclose the ability to reach the intended audience. See McDonald, 556 F. Supp. 3d

at 1360 (citing <u>Weinberg v. City of Chicago</u>, 310 F.3d 1029, 1041 (7th Cir. 2002); <u>Gresham v. Peterson</u>, 225 F.3d 899, 907 (7th Cir. 2000)). "[Additionally,] the law is well-settled that the alternative channel 'does not have to be the speaker's first choice.'" <u>Id.</u> (quoting <u>Weinberg</u>, 310 F.3d at 1041).

In another context, the Eleventh Circuit has found that "unlimited access to the City-owned streets and sidewalks adjacent" to a prohibited area constitutes ample alternative channels of communication. <u>Daniel v. City of Tampa, Florida</u>, 38 F.3d 546, 550 (11th Cir. 1994) (considering alternative means for distributing information at a nonpublic forum and finding that the appellant's arrests for violating Florida's trespass after warning statute did not violate his First Amendment rights). The Eleventh Circuit has also found that where an ordinance "does not prohibit leafletting, distributing pamphlets, or marching on the streets not adjacent to, or leading directly to the courthouse grounds," the appellant "has many alternative means to communicate its message." <u>Nationalist Movement v. City of Cumming, Ga.</u>, 92 F.3d 1135, 1140 (11th Cir. 1996).

Consistent with constitutional requirements, the City has shown that Plaintiffs' message has not been rendered useless or even seriously burdened by the Ordinance. As in <u>Daniel</u> and <u>Nationalist Movement</u>, Plaintiffs and the Protesters may still engage in their usual respective activities on the full expanse of the remaining sidewalks on either side of the private driveway outside the Vehicular Safety Zone.

Plaintiffs and all other Protesters can and do still reach their intended audience. Plaintiffs admit that nothing in the Ordinance prohibits persons desiring to speak with sidewalk counselors from walking over to the sidewalk and conversing with them. (Dkt. 43 at 87:16–21) Moreover, nothing prohibits Plaintiffs from passing leaflets to persons desiring such leaflets, and nothing prohibits the counselors from counseling with persons who walk up to the facility as they traverse the sidewalk. Any concern by Plaintiffs that their preferred lowered tones will not be heard over the louder Protesters was an issue pre-dating the Ordinance. Nothing in the Ordinance prohibits the loud and vociferous protests or the quiet and calm ones from occurring.

Therefore, the Court finds that the City has shown at the preliminary injunction stage that it will likely prevail on the question of whether the Ordinance allows ample alternative channels of communication.

## IV.   CONCLUSION

Accordingly, the Court finds that the evidence demonstrates that the City will likely be able to prove that the Ordinance is justifiable as a reasonable time, place, and manner restriction that is content-neutral; is narrowly tailored to a significant government interest in vehicular safety; and allows ample alternative channels of communication. The Court thus finds that Plaintiffs have not shown a substantial likelihood of success necessary for a preliminary injunction. Consequently, the Court need not reach the remaining elements required for a preliminary injunction at this time. See Barber, 73 F.4th at 1317.

28

Upon consideration of the foregoing, the Court hereby **ORDERS** that Plaintiffs'

Amended Time-Sensitive Motion for Preliminary Injunction, (Dkt. 16), is **DENIED**.

**DONE and ORDERED** in Tampa, Florida this 20th day of October 2023.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record
Any Unrepresented Party